701 A.2d 1113

The BOARD OF COMMUNITY COLLEGE TRUSTEES
FOR BALTIMORE COUNTY—ESSEX
COMMUNITY COLLEGE

v.

Jane ADAMS et al.

No. 1379, Sept. Term, 1996.

Court of Special Appeals of Maryland.

July 8, 1997.

Reconsideration Denied Sept. 24, 1997.

John A. Austin, Towson, for Appellant.

Barry L. Steelman and Stanley Turk, Baltimore, for Appellees.

Argued before MURPHY, C.J., and CATHELL and HOLLANDER, JJ.

CATHELL, Judge.

The Board of Trustees of the Baltimore County Community Colleges appeals from the granting of a writ of mandamus requiring it to reinstate Jane Adams and Gwen Nicholson, tenured professors at Essex Community College, appellees, to

their prior positions. Appellant presents three questions on appeal:

I. Did the trial court commit error in awarding mandamus relief to the Appellees?

II. Did the trial court commit error in ordering the reinstatement of the Appellees to teaching positions that no longer existed?

III. Did the trial court commit error in ordering backpay to be paid to the Appellees?

## The Facts

Certain facts are basically uncontested. Appellees were tenured professors at Essex Community College. In 1991, the governing bodies, the State and county, that funded most of the operations of the college drastically reduced appropriations to the school. The college, believing that personnel and staff cutbacks were inevitable, began to study the programs and courses it offered to determine which, if any, programs were to be scaled back or terminated. A process was put in place by the "Division Chairs," presumably the heads of the various departments at the college, called the Four Flags for Andy[1] program. Under it, each department and program was evaluated in terms of enrollment, section size, and other considerations. A committee was then formed composed of the Dean of Instruction, a representative of the faculty senate, a representative of the Academic Council, and a representative "from the counseling area." The committee met over a period of several months considering all of the material on the budgetary crisis, enrollment, etc. This committee then made certain recommendations on how the financial difficulties should be addressed. It recommended termination of seven

---

1. Andy was the first name of the president of the college. The "flags" terminology was merely a way of trying to determine which programs were more appropriate for termination, if necessary. Each flag identified a negative attribute of a program. The higher the number of flags, the less justifiable, in terms of need, the program. Any program with four or more flags, in terms of need, enrollment, duplication, etc., was a candidate for termination.

programs. The Board of Trustees, appellant, ultimately approved the program terminations in 1993. One of the programs terminated was the "Office Technology" program, in which appellees taught.

Appellees, in March of 1993, were apprised by a dean of the college that they would be terminated on July 1, 1994. Appellees submitted additional information to the dean, but the decision remained unchanged. Appellees then initiated the grievance process of the college. Ultimately, the grievance process ended with a hearing before the Board of Trustees— the final step in the grievance process. The Board denied the grievance.[2] As a result of the termination of the program, appellees were ultimately terminated from their faculty positions in 1994. At no time were any allegations made that appellees were being terminated for behavioral or qualification problems.

There is a preliminary issue as to the scope of the trial court's findings that needs to be addressed. The issue is whether the trial court addressed the issue of the financial reasons underlying the terminations. We hold that it clearly did. We explain.

In appellees' complaint for mandamus relief, they asserted:

The purported reason for the termination of [appellees] was the discontinuance of the associate degree program in Office Technology, in which [appellees] had been teaching. [The] decision to terminate [appellees] was "based solely on a review of programs and functions." Thus, in contradiction of the express terms of their Contracts, [appellees] were not terminated for any of the enumerated grounds therein....

c. The termination of the Office Technology program was not sufficient cause under [appellees'] Contracts to terminate them. [Citation omitted.]

The provisions of the contract executed in the early 1970s, that was apparently a standard form contract of that time,

---

2. While the grievance process was under way, appellees had been placed in paid administrative positions.

upon which appellant's complaint was based, provided in relevant part:

> [A]fter said faculty member has been placed on continuous tenure, his [her] appointment may not be terminated except as provided herein.
>
> . . . .
>
> ... The Board of Trustees may dismiss said faculty member ... for immorality, dishonesty, misconduct in office, incompetency, insubordination, or willful neglect of duty. . . .

The contract contained no specific provisions relating to procedures that would apply if the college was forced to terminate programs for reasons not related to the personal performance or conduct of a professor. It contained no provisions for priorities between tenured professors, reassignments, relocations, retraining or the like. It is agreed by all parties that appellees' performance and conduct was not in question.

The complaint later asserted that in the grievance process appellees initiated, the Faculty Appeals Committee found that they were not terminated "for any of the reasons set forth in their Faculty Contracts." They noted that counsel for appellant in a letter to the Faculty Appeals Committee had maintained: "Thus, because the elimination of the program [sic] in question *as one means of addressing* [*the college's* ] *financial difficulties,* and because the elimination of the programs eliminated the subject matter of the contract, then neither party could be required to perform their obligation under the contract." (Brackets in complaint; emphasis added.) Appellees also asserted in this complaint that the Faculty Appeals Committee found that no formal "financial exigency" had been declared. They noted that the college's president denied their grievance in spite of the Faculty Appeals Committee's recommendations. Appellees ultimately asserted in the complaint that they "have a plain and clear right to have continued employment ... until they are discharged for one of the enumerated reasons set forth in their contract."

Appellant moved to dismiss the complaint, asserting that mandamus was an inappropriate remedy in that there was clearly an adequate remedy at law, *i.e.,* a suit for damages. Appellant also asserted that mandamus was inappropriate in that the Board's final action was nonappealable, leaving only the remedy of damages, and that appellees were improperly using a writ of mandamus to obtain judicial review of the Board's discretionary action.

Later, appellees filed an amended complaint for mandamus, and in it they again conceded the existence of the "Four Flags for Andy" program that was created to select programs for termination. They acknowledged that "Four Flags" had selected the "office technology" program for termination, but contended that it was done "secretively" and "arbitrarily." This amended complaint was a superseding complaint in that it did not incorporate the prior complaint. Appellees asserted due process deficiencies in the grievance process, and complained that at the final stage of the grievance process, they had been improperly limited in respect to time allotted to present their position. They noted, again, that appellant's original contracts were not course specific but that their contracts simply were to "teach in the community college."

Appellees additionally complained that other professors with less tenure had been rehired and that male professors had been rehired. They also noted that an outside faculty agency had concluded that appellant had acted improperly and that there were still courses at the college that appellees were qualified to teach. That outside agency indicated that it had a belief that the college had improperly failed to relocate the professors.

Again, appellant filed a Motion to Dismiss based mainly on its belief that mandamus was an inappropriate claim. In its new Motion to Dismiss, appellant proffered the following additional argument:

9. That to the extent that the amended complaint *seeks to have this court control or direct the statutorily mandated authority over the expenditure of public monies allocated to*

*the Board,* mandamus relief is likewise unavailable as decisions concerning expenditures of public funds are by their very nature, discretionary actions as to which mandamus relief will not lie. [Emphasis added.]

Ultimately, appellant attempted to file an amended answer to the amended complaint that stated in relevant part:

6. [Appellees] are not entitled to the mandamus relief sought because the termination of their positions as alleged in the Amended Complaint was done *because of the severe financial difficulties facing the [appellant at] the time the action was taken, which financial difficulties required the termination of seven different academic programs at the College and the termination of ten full-time tenured faculty positions.* The elimination of the seven programs and the termination of the ten faculty positions occurred following a lengthy and detailed review of the academic programs at the College in response to the financial crisis created by cutbacks in state and local funding.

. . . .

9. [Appellees] are not entitled to the declaratory relief sought as the termination[s] . . . occurred as a result of the financial difficulties experienced by the College . . . requiring termination . . . in accordance with generally accepted principles concerning the concept of academic tenure.

The trial court initially rejected the answer as untimely but ultimately permitted the matters in that answer to be presented and litigated and the trial court resolved them—thus basing its findings on a resolution of that issue. In its oral opinion, the court stated:

As such, it is the Court's opinion that I should strike all of the testimony regarding that particular defense and should grant the writ of mandamus. I suspect as my Uncle Gus Grason who sat on this bench and the Court of Appeals for many years suggested at one time, I am a mere whis[t]lestop on the way to the Appellate Court. *So, I am going to continue and decide what I determine to be the actual merits of the controversy here so that the Appellate Court*

*will not feel compelled to return it for a decision on the
facts itself.* [Emphasis added.]

As we shall later indicate, the trial court made findings on
the financial situation at the college. His findings were,
however, as we shall indicate, clearly erroneous.

### Discussion

■ There is one primary underlying question for this
Court to resolve:

> May tenured faculty with no behavioral or qualification
> problems be terminated when the course or program she or
> he teaches is terminated due to financial difficulties?

The parties have not directed us to any Maryland cases
directly on point. We have found only one, *County Bd. of
Educ. v. Cearfoss,* 165 Md. 178, 166 A. 732 (1933), that
suggests, in well reasoned dicta, that the answer is yes. We
shall address *Cearfoss* later. Our review of the authorities
elsewhere indicates that the great weight of authority sup-
ports a holding that tenured professors may be terminated for
reasons unrelated to them personally—such as discontinuance
of courses, school consolidations, and, as in the case *sub
judice,* financial shortfalls. We shall discuss certain statutory
provisions relating to community colleges, several cases con-
cerning the clearly erroneous rule, then distinguish two of our
recent cases, and ultimately discuss the relevant case law on
tenure.

### Relevant Statutes

Maryland Code (1974, 1997 Repl.Vol.), § 16–103 of the
Education Article, Powers of board of trustees, provides:

> (a) *In general.*—In addition to the other powers granted
> and duties imposed by this title . . . each board of communi-
> ty college trustees has the powers and duties set forth in
> this section.
>
> . . . .

(c) *General control; rules and regulations.*—Each board of trustees shall exercise general control over the community college....

(d) *Salaries and tenure.*—Each board of trustees may fix the salaries and tenure of the president, faculty, and other employees....

Other sections are also relevant. Section 16–104(b)(3) of the Education Article provides in relevant part that the president of a community college "[s]hall recommend the discharge of employees for good cause; however, any employee with tenure shall be given reasonable notice of the grounds for dismissal and an opportunity to be heard." Section 16–301, Budget, provides that the board of trustees and the president "shall prepare and submit" a budget to the county governing body. The governing body then reviews the budget and has the power to "reduce it." Section 16–305 provides the basis for the computation of revenue sources and responsibility/sharing by the State and the county (or counties in respect to regional community colleges). The budgetary amounts are at all times dependent upon whatever appropriations are made by the respective governing bodies. Section 16–304 requires county governing bodies to make appropriations for certain "major functions" and restricts the colleges by not allowing them to "spend more on any major function than the amount appropriated for it."

In order to frame the economic situation appropriately, we consider the specific factual parameters of the time. Initially, we discuss a brief history of the statutes establishing the funding of community colleges. In the 1970s, the State's contribution to community colleges was "50%" to "55%" of "current expenses" with per student caps. The county's share was "28%" to "32%" of "current expenses." By 1988, the State's share was "50%" but with per pupil caps. The county's share remained at between 28% and 32% with caps. The statute required the county to maintain its then current funding or lose any future increases in State assistance. By 1988, there were provisions for supplemental funding as well. The current statute has a much more complicated funding

procedure in which the State's contribution is based on the amount it contributes on a per pupil basis to the State's four-year universities. See the codifier's note contained in the 1992 Cumulative Supplement. It focuses on the State's revenue shortages reflected in many other areas of the State budget, as we shall indicate, as the precipitating factor in the reduction of funding to community colleges. It was this reduction that apparently caused the financial problems at Essex Community College and appears to reflect the situation and period at issue in the case *sub judice*. The note indicates that, notwithstanding the statute's funding specification, "the amounts due ... may be reduced by the Governor ... 'if the state experienced certain revenue shortfalls.'" Under differing revenue reductions, the Governor was authorized to make reductions in the total budget of the community colleges of Baltimore County of either $14,592,589, $11,542,161, or $8,244,401. See the annotations to Md.Code (1974, 1991 Repl. Vol., 1991 Cum.Supp.), § 16–403 of the Education Article. It was the implementation, or the potential of implementation, of these State budgetary constraints that apparently precipitated the financial problems of the college at issue during the period when the "Four Flags For Andy" and other programs were put in place to address the actual financial problems and anticipated future problems.

There have been at least four cases that have been resolved at the appellate level arising out of the State's budget problems in the early 1990s. The most recent case is *Comptroller of the Treasury v. Nelson*, 345 Md. 706, 694 A.2d 468 (1997), involving informal suspension of reclassifications based upon an informal memorandum from the Governor freezing hirings; *Workers' Compensation Comm'n v. Driver*, 336 Md. 105, 647 A.2d 96 (1994), *cert. denied*, 513 U.S. 1113, 115 S.Ct. 906, 130 L.Ed.2d 789 (1995), involving the effect of "lay off" provisions in respect to State employees whose positions are terminated due to budgetary reductions; *Judy v. Schaefer*, 331 Md. 239, 627 A.2d 1039 (1993), where recipients of public assistance challenged the Governor's right to reduce budget appropriations; and *Maryland Classified Employees Ass'n v. Schaefer*,

325 Md. 19, 599 A.2d 91 (1991), *cert. denied,* 502 U.S. 1090, 112 S.Ct. 1160, 117 L.Ed.2d 407 (1992), involving an increase in the work week for State employees. While the cases generally involve direct attacks against the budget reductions as opposed to indirect attacks by the raising of challenges to the results of the budget reductions, there are some similarities. We note that the State's budgetary problems were widely known throughout the relevant period, as is evidenced, at least in part, by the cases.

In *Nelson,* the Court of Appeals distinguished the facts of that case from the facts of *Maryland Classified* and *Judy.* The controversy in *Nelson* involved the effect of a memorandum from the Governor that directed a *"hiring freeze"* upon a merit-system employee's right to reclassification. The Court noted that the executive order in *Maryland Classified* was distinguishable from that in *Nelson* because it "was clearly authorized by the statute." *Nelson,* at 718, 694 A.2d at 474. Distinguishing *Judy,* it stated in *Nelson,* "There, we held that the Governor's reduction of the appropriations was in accordance with a statute which specifically delegated such authority to the Governor." *Id.* at 718, 694 A.2d at 474.

The *Nelson* Court also distinguished its holding from *Driver,* in which

> two state employees argued that, despite the existence of a budget bill provision which expressly eliminated appropriations for their positions, they were entitled to the protection of the merit system rules applicable to laid-off agency employees.

*Nelson,* at 717, 694 A.2d at 473–74. The *Nelson* Court noted, in respect to *Driver,* as we ultimately imply at the conclusion of our opinion, " 'the decision to delete from the budget bill the appropriations for [the employees'] positions must be treated *wholly as the decision of the General Assembly.'* " *Id.* at 717, 694 A.2d at 474 (quoting *Driver,* 336 Md. at 118, 647 A.2d 96). The *Nelson* Court then concluded its discussion of *Driver:*

> In support of its conclusion in *Driver,* this Court relied upon *Hopper v. Jones,* 178 Md. 429, 13 A.2d 621 [ (1940) ], where

this Court similarly held that the layoff statute is inapplicable when an enacted budget bill expressly deleted the appropriation for a particular employee's position.

*Nelson,* at 717, 694 A.2d at 474.

In the case *sub judice,* the "lay-off" statute, Maryland Code (1957, 1988 Repl.Vol., 1991 Cum.Supp.), Art. 64A, § 35(b), is not applicable to appellees and was not, in any event, relied upon by them. It is uncontested, moreover, that the budget legislation applicable here drastically reduced appellant's budget. Unlike *Nelson,* in this case the General Assembly allegedly created legislation[3] that specifically authorized the Governor to reduce the budget of the Baltimore County Community Colleges, and this is what was actually done.

The *Driver* Court noted:

Under Article III, § 52, of the Maryland Constitution, the General Assembly, and only the General Assembly, can enact the annual budget for the State. Under § 7–213 of the State Finance and Procurement Article, the Governor, and only the Governor, can reduce appropriations in the budget up to 25% after the budget has been enacted.

336 Md. at 119, 647 A.2d 96. Referring to *Hopper v. Jones,* 178 Md. 429, 13 A.2d 621 (1940), the *Driver* Court continued:

The *Hopper* opinion indicated that the language encompassed the abolition of a position by the agency itself or by the budget process when jobs were reduced without targeting specific positions, but that the language did not cover the total removal of funding for the specific position in the state budget.

336 Md. at 120, 647 A.2d 96.

In *Maryland Classified,* the Governor, by executive order, increased the work week of many State employees from thirty-five and one-half hours to forty hours per week without a corresponding increase in compensation. The Governor's

---

3. As we indicate elsewhere, budgets go through the legislative process and are authorized by the General Assembly.

order directed the Secretary of Personnel and "the appointing authorities to 'take all actions necessary . . . to implement this directive.'" 325 Md. at 21, 599 A.2d 91. Maryland Classified Employees Association, which represents many State employees, filed a declaratory judgment action seeking to have the Governor's order declared void *ab initio*. They argued that the Code of Maryland Regulations specified a thirty-five and one-half hour work week and that the Governor's order could not change the work week because (1) since he was not the appointing authority he could not change the work week; (2) that another statute required extra compensation for hours worked above a "work week" as defined in the Regulation; and (3) that the Governor was not empowered to make changes inconsistent with the thirty-five and one-half work week "absent legislative authorization.".

The employees claimed that they had "a property right in their employment [that] cannot be taken from them without due process of law," *Id.* at 23, 599 A.2d 91, and that the Governor's actions violated the "separation of powers" provisions of Article 8 of the Maryland Declaration of Rights. The employees further claimed:

[T]hat because they "accepted jobs with compensation established on a 35 1/2 hour work week, . . . worked at those jobs for many years, . . . made child care, home and family commitments based on the State's promise of a 35 1/2 hour work week, [they] have acquired a vested right . . . in the continuation of a 35 1/2 hour work week, and compensation for hours worked in excess of 35 1/2 hours." Moreover, based upon these alleged facts, the plaintiffs averred that they have an express or implied contract with the State to work a 35 1/2–hour work week, with overtime or compensatory time for all hours worked in excess of 35 1/2 hours; and that as a result of the Governor's order, their contract with the State has been breached and will cause them monetary and nonmonetary damages.

*Id.* They also claimed:

[T]hat the Governor's order violated provisions of Code (1988 Repl.Vol., 1991 Cum.Supp.), Article 64A (the State's

Merit System Law), pursuant to which the Secretary of Personnel promulgated the State's "Salary Plan." ... The plaintiffs alleged that the Secretary's Salary Plan has the force of law and includes a rule that the rate of pay for any employment classification cannot be changed except as authorized by the Legislature; and when the salary plan became effective, the duties and classifications of the plaintiffs were those performed within a 35 1/2–hour work week. Consequently, they averred that "the salaries and compensation for the classifications in the salary plan were established by the Secretary and approved by the Governor fully recognizing that the compensation rates were a 35 1/2 hour work week and that the employees would receive additional overtime compensation for all hours worked in excess of 35 1/2 hours per week." According to the plaintiffs' suits, to increase the hours of the work week results in lowering the rate of pay for positions within the salary plan, an action that cannot lawfully be initiated except by the Secretary in accordance with the provisions of § 27 of Article 64A; that the pay plan cannot otherwise lawfully be amended; but that "the Secretary and Governor failed to act as required by said section which requires that the amended pay plan be reported to the General Assembly by the 15th day of a regular session which was not done." Because of this failure, the plaintiffs asserted that the Governor's Executive Order, which in effect altered the salary plan, was not within his lawful authority and was therefore invalid.

*Id.* at 23–24, 599 A.2d 91.

The specific questions raised by the employees were:

1. Whether the Governor's Executive Order requiring the Plaintiffs to work a 40 hour work week without additional compensation violates the doctrine of Separation of Powers.

2. Whether the Governor's Executive Order requiring the Plaintiffs to work a 40 hour work week without additional compensation *violates the Plaintiffs' contract rights.*

3.   Whether the Governor's Executive Order requiring Plaintiffs to work a 40 hour work week without additional compensation *violates the Plaintiffs' procedural due process rights.*

4.   Whether the Governor's Executive Order requiring Plaintiffs to work a 40 hour work week without additional compensation violates the State's Pay Plan Law.

*Id.* at 25–26, 599 A.2d 91 (emphasis added).

The Court noted:

The [employees] maintained in the circuit court, as they do before us, that the Governor's Executive Order constitutes a "taking" of the property interests of State employees in contravention of their due process rights. Specifically, they argued that by increasing the number of hours worked without increasing compensation, the Governor deprived them of their right to additional compensation without the traditional due process rights to notice, hearing, and an opportunity to be heard. As to this, Judge Thieme observed that there was no "taking" of a constitutionally protected property interest because the existing regulation of the Secretary of Personnel clearly defined the work week and specified that it is subject to change at the discretion of the appointing authorities. Consequently, he said, that since there was no property interest, there could be no denial of due process. He concluded that "[f]ar from creating an entitlement, the work week regulations affirmatively deny the creation of any property interest in a 35 1/2–hour work week." In so concluding, the circuit court held that nothing in the Supreme Court cases relied upon by the plaintiffs mandated a different result. We are in full accord with Judge Thieme's reasoning.

*Id.* at 35, 599 A.2d 91 (footnote omitted). It then discussed the State pay plan:

The plaintiffs urge us to find that the Governor's Executive Order violated the State Pay Plan because it was inconsistent with certain procedures required by the Legislature before employees' salaries may be amended. Specifi-

cally, they claim that the Governor contravened § 27 of Article 64A by altering salaries of State employees without the legislative approval required by that statute. In this regard, the plaintiffs say that a change in the work week is a change in the salary plan, and that such a change cannot be effectuated by an Executive Order.

. . . .

In its most basic form, it is the plaintiffs' argument that an increase in the hours of the work week is a "working condition" within the contemplation of Article 64A, § 27(a)(1)(i) which, because the increase results in a reduction of salaries, constitutes an amendment to the pay plan. Hence, they say that this criteria for establishing rates of pay had to be factored into an amended pay plan and reported to the General Assembly before it could be implemented.

*Id.* at 36–37, 599 A.2d 91. The Court then opined:

The fiscal year 1991 State Budget documents show that the increase in the work hours resulted in a cost-savings through the denial of additional appropriations for new positions and by reducing overtime costs. The increased hours did not cause a reduction of any salaries within the pay plan. Because there was no amendment to the pay plan, no notice to the General Assembly was required under § 27(a)(3)(v). We, therefore, share Judge Thieme's conclusion that the Governor's Executive Order did not effectuate an amendment to the State pay plan.

*Id.* at 37–38, 599 A.2d 91.

*Judy* is somewhat more akin to the instant case than *Maryland Classified.* The appellants in *Judy* were recipients of funds from several State programs and agencies. There, section 7–213 of the State Finance and Procurement Article authorized the Governor, with the approval of the Board of Public Works, to reduce "any appropriation" by up to twenty-five percent if the Governor perceived the appropriation to be unnecessary. As we indicate elsewhere in the case *sub judice,* similarly, in this case, a statute governing the funding of the

community college at issue permitted the Governor to reduce the appropriations to the Baltimore County community colleges by certain specified, substantial sums, upon the happening of revenue receipt reductions from specific taxes.

In *Judy*, the Governor reduced the budget of the specific agencies by several millions of dollars. Here, he apparently did the same, albeit pursuant to a different statute. The *Judy* Court noted that, "pursuant to an order signed by the Governor, the Comptroller adjusted the accounts of all state agencies to reflect the reduced appropriations." 331 Md. at 242, 627 A.2d 1039 (footnote omitted). Thereupon, Judy filed a petition to enjoin the Governor and others "from reducing her public assistance benefits." *Id.* at 243, 627 A.2d 1039. Much like the employees in *Maryland Classified*, Judy argued constitutional issues, including separation of powers, lack of authority, and that the Governor's action was "arbitrary, capricious and unsupported by substantial evidence." *Id.* The Court noted that the appellees, among other arguments, had asserted that the Governor's action "was not judicially reviewable for arbitrariness, capriciousness or lack of evidentiary support." *Id.* at 243–44, 627 A.2d 1039.

Judge Eldridge, for the Court, in an extensive history of the budgetary process, stated:

> As the trial court recognized, fundamental to the resolution of this dispute is the nature of Maryland's executive budget system. This Court, on several occasions, has discussed the requirements and history of that system. *See Kelly v. Marylanders for Sports Sanity*, 310 Md. 437, 450–461, 530 A.2d 245 (1987); *Bayne v. Secretary of State*, 283 Md. 560, 567–569, 392 A.2d 67 (1978); *Md. Act. for Foster Child. v. State*, 279 Md. 133, 140–153, 367 A.2d 491 (1977); *Panitz v. Comptroller*, 247 Md. 501, 505–509, 232 A.2d 891 (1967); *McKeldin v. Steedman*, 203 Md. 89, 96–103, 98 A.2d 561 (1953); *Dorsey v. Petrott*, 178 Md. 230, 241–244, 13 A.2d 630 (1940); *Baltimore v. O'Conor*, 147 Md. 639, 644–646, 128 A. 759 (1925). We have not, however, dealt with the authority of the Governor to reduce an appropriation after the budget bill has passed.

. . . .

These limitations were seen as essential to the task of devising a system that would avoid the accumulation of a deficit and ensure that the Governor's plan of proposed expenditures could not be amended in such a way as to exceed estimated revenues. Article III, § 52(5a), expressly mandates that the Governor propose and maintain a balanced budget. The Goodnow Commission Report, *supra*, at 129–130, states:

"It will be noted that the [Democratic Party] platform provides for a budget system prepared by the Governor or the Board of Public Works, the items of which can be reduced or eliminated, but not increased, by the Legislature.

"This limitation is fundamental in our judgment for a sound budget system."

. . . .

... As Judge Alan M. Wilner [Judge of the Court of Appeals], explained in his book *The Maryland Board of Public Works: A History*, at 85 n. 20 (1984),

"This authority [to reduce an appropriation deemed unnecessary by 25%] was in addition to the even more comprehensive control delegated to the governor. In the 1931 budget (Acts of 1931, ch. 150), the General Assembly had stated that the items enumerated in the bill constituted only an 'initial plan of disbursement' and that the governor could, if he chose, amend that schedule with respect to executive agencies. Sec. 7 of the 1933 budget retained the concept of 'initial plan of disbursement,' but in contrast to its predecessors it *required* all executive agencies to submit to the governor an amended itemized schedule and permitted disbursement only to the extent the governor approved the amended schedule. This, in effect, made the budget bill a mere starting point and gave the governor total control over the state budget ... "

331 Md. at 245–53, 627 A.2d 1039 (footnotes omitted). After that review, the Court opined:

> The Governor also may amend an appropriation by reducing, by not more than 25%, any appropriation which he deems to be unnecessary, § 7–213 [of the State Finance and Procurement Article]. The Governor may not, under this provision, reduce an appropriation for the Legislative or Judicial Branches, for the payment of principal of or interest on the state debt, for the public schools, for the salary of a public officer during the term of office, or for the salary of an employee in the classified or unclassified service, except as provided in the Merit System Law. § 7–213(b).

*Id.* at 256–57, 627 A.2d 1039.

In the present case, as we earlier indicated, specific statutory authority was conferred under a different statute permitting the Governor, under certain circumstances, to reduce the budget of the community college at issue here. In the case *sub judice,* no one challenges the validity of that statute or the reductions made under it. The challenge is directed only to the result of the reduction, the termination of tenured faculty. The *Judy* Court concluded:

> Section 7–213 [the statute that authorizes the reductions in that case] provides a mechanism by which the Governor can fulfill his constitutional obligation to maintain a balanced budget and to avoid a deficit when the estimated revenues used in the budget bill are too high. The power of the Governor to reduce appropriations under § 7–213 is consistent with the power of the Governor in the budgetary process, and, as proven in 1933 and 1935 as well as in the 1990's, is "necessary ... to carry out" the balanced budget requirement of Art. III, sec. 52(5a).

331 Md. at 269, 627 A.2d 1039 (footnote omitted).

While neither of the above cases bears directly on the statute here at issue, or on the specific budget reductions that created the need for the program reductions, they are, nonetheless, illustrative of the serious budgetary problems then existing that ultimately resulted in the substantial reduction in

the budget of Essex Community College. The case we here consider was not happening in a vacuum. This case was a part of the larger overall financial situation then extant for governmental entities.

■ As we have indicated, appellees chose not to attack directly the underlying financial crisis, relying, at last initially, on the contract language we include elsewhere. In the case at bar the trial court found that the statement of the existence of a financial crisis in appellant's amended answer was "set forth at the eleventh hour when [appellant] became in somewhat of a desperate situation to substantiate the termination of these two individuals."

We note, however, appellees did not aver the reasons although they were aware of them. They relied solely on their contracts. Appellant, in responding to the complaints initially limited its factual response, perhaps injudiciously, to the averments of the complaints including the averments in the amended complaint as to the termination of the program.

The existence of the financial crisis, however, was not an eleventh hour disclosure to appellees. Nor were the college's reasons for releasing the professors, i.e., that the program had been terminated, inaccurate. The program was terminated, and early in the process—long before the suit was filed—the financial problems causing program terminations were shared with appellees. Had the trial court realized all that had gone before, we do not believe that it would have felt that appellant's position was formulated in the "eleventh hour." We explain.

In April of 1993, Dean Snope mailed letters to appellees. The one to Professor Nicholson stated in relevant part:

> I have recommended to Dr. Slowinski, and he has agreed to recommend to the Board ..., that the Office Technology program and your employment with the College be terminated effective July 1, 1994....
>
> ....

Please make an appointment with the Director of Personnel ... as soon as possible to discuss your retirement plan ... and any questions you may have....

This letter was not inaccurate. Appellees were terminated because of the discontinuance of the program. The letters did not inform appellants of the reasons, *i.e.,* financial reasons, for the discontinuance of the program. That was fully explained, however, long before the 1995 filing of appellee's complaint in the circuit court.

The minutes of the grievance hearing of February 16, 1994, before the Board of Trustees is identified in the extract as one of appellees' exhibits before the trial court. At that hearing the following occurred, during an exchange with a representative of the college administration (apparently Dr. Snope):

Q. Where have you told faculty members that they should worry about the financial status of this institution?

A. Many times in many forums usually oral.

Q. Now, if I understand what you have said correctly, you have stated that you made the recommendation that the ten people whose primary responsibility was to teach courses in a specific program would be cut; is that correct?

A. That's correct.

Q. Is it your testimony then that each of the ten people at the time that you recommended to the president that they would be cut that their primary job at this school at that time was to teach courses in that program; is that correct?

A. That's true for most of them.

Dean Snope also stated at the February 16, 1994 grievance hearing before the Board of Trustees:

Since 1991, the college has experienced a total of 4.8 million dollars in state budget reductions, and our county appropriation this year is 2.8 million dollars less than it was in FY '91.

The instructional area of the college which I manage requires more than 50 percent of the college budget, and

these reductions have a major impact on our ability to continue to provide quality teaching and learning experiences for our students.

The faculty and the entire college community have been kept fully informed of our budget situation and of the financial condition of the college through regular written and oral reports from the president, as well as on occasion from the deans.

In the fall of 1991 when it appeared that our budget challenges would be long term and that we could not continue business as usual, I initiated in the instructional area a review of administrative functions and of all of our academic disciplines and programs.

The original purpose of that review was to provide a rational basis for making decisions to possibly change or eliminate less efficient and less effective programs and services with the objective of preserving and strengthening the core mission of the college while resources continued to shrink.

. . . .

At my request, the Four Flags system recommended by the Chairs was reviewed by our Academic Council and by the Faculty Senate and was finally ready for implementation late in the spring of 1992.

I established a review committee consisting of both faculty and administrators and charged them with evaluating the 20 program areas indicated by the Four Flags system as being most in need of review based on early indicators of enrollment problems.

. . . .

After receiving the recommendations from the program review committee last spring, I reviewed them extensively with my staff, with each of the division heads involved and with the president's staff. Based on those lengthy deliberations, I recommended to President Slowinski that seven career programs and four transfer disciplines be discontinued effective July 1, 1994.

In addition, I recommended that the contracts of the ten full-time faculty whose primary responsibility it was to teach courses in those program areas be terminated effective July 1, 1994 when those programs and the courses that they are primarily responsible, are primarily responsible to teach will no longer be offered.

In keeping with the terms of their contracts which require a one-year notification period, I informed those faculty last May of their recommended terminations. All ten of those faculty members accepted my invitation to discuss my recommendations with me, and I, indeed, carefully considered each appeal and responded to each one in writing.

In addition, six of the ten faculty have taken advantage of the opportunity to appeal through the college's own internal grievance process. This hearing is the final stage of that process.

The major points of my testimony are these: 1. The college found itself in serious financial difficulty.

2. It was my responsibility to the board, to the students and to the citizens of Baltimore County as the chief academic officer of this institution to recommend to the president actions that would enable us to continue to provide quality instruction with significantly less money.

3. The decisions made were management decisions about programs and disciplines, had nothing to do with faculty performance and were handled in accordance with the requirements of faculty contracts.

4. In order to assure that the best possible decisions were made, I chose to establish an open, thorough and participatory process, one that involved in a significant way as I have indicated earlier those faculty affected by the program evaluations, as well as involving other key member of the campus community.

At their public meeting of August 25, 1993, the Baltimore County Board of Trustees voted unanimously to support the curriculum decisions that were made by approving the recommended program terminations brought before it by

President Slowinski and recommended by the board's Academic Affairs Committee. The faculty contract termination recommendations which have not yet been brought to the board for action are, of course, pending the outcome of this appeals process.

Moreover, appellees were fully aware prior to the filing of their lawsuit of the "Four Flags for Andy" report. In their Grievance Petition to the Board of Trustees, in addition to pointing out that current contracts (unlike the contracts of the 1970's) contain a specific financial exigency reason for termination,[4] they noted that "Indeed, Professor Adams and Professor Nicholson presented a well supported response to the Four Flag's report...."

The "Memorandum"[5] of the Faculty Appeals Committee (Committee) also referred to a meeting between appellees and Deans Scott and Snope on April 29, 1993, in which Dean Snope read the "Four Flags Committee's Report." That Committee in its report discussed who was required to know of financial problems.

> Our first concern is ... with the statement that the financial difficulties of the college are well-known and *bona fide*. It is not clear to us who must know about the college's financial difficulties and who declares them to be *bona fide*....

---

4. As to tenured professors, the current contract provides, "his/her appointment may not be terminated *except* for a bona fide financial exigency *or* the discontinuance of a program or department, or discontinuance of individual positions because of ... lack of funding ... written notice must be given at least twelve (12) months prior to the effective date of termination." (Emphasis added.) Twelve months notice was given in the present case. Thus, it is clear that the current contract does not require the declaration of a "financial exigency." The use of the conjunction *"or"* indicates clearly that termination can occur when funding for programs is lacking.

5. The various college level proceedings we make reference to are identified in the extract as part of either defendant's or plaintiffs' exhibits before the trial court.

There are too many unknowns for us to be able to state a position on this question.

Later, the appeals committee expressed another concern:

Lastly, it is troublesome to the Faculty Appeals Committee that the fiscal health of the college was not severe enough to declare a financial exigency and yet it was deemed bad enough to yield the same, or an even more severe[ ] outcome—termination of tenured faculty members. If faculty terminations were deemed necessary, the contingency plan should have been followed.[6]

The Committee also noted Dr. Snope's opinion that, even if the Four Flags process had been procedurally flawed, the problems were not sufficiently severe to "warrant voiding the results." The Committee noted that Dr. Snope

stressed that the financial health of the college was so bad that he was duty bound to terminate faculty members. We are not privy to the financial records ... so we cannot dispute his conclusions....

The Committee nonetheless recommended against termination.[7]

There was also substantial other pretrial evidence that was ultimately admitted by the trial court supporting the position of the College that appellees were terminated because of *program discontinuances caused by financial problems.* In a letter to the Four Flags program, one of the appellees indirectly acknowledged the fiscal situation when Professor Nicholson noted "The economy will improve. I hope that the college doesn't take any drastic measures that it may regret." On April 30, 1993, the program discontinuance and termi-

---

**6.** As we are remanding for the trial judge to consider the due process allegation in respect to *which* professors should have been terminated, we surmise that this contingency plan *may be relevant in that context.*

**7.** In their request to the Committee, appellees' acknowledged their familiarity with the "Four Flags" program. Their counsel stated that he believed that the program violated appellees' contracts, as well as their constitutional statutory rights.

nation decisions were included in a summary. It concluded: "When fully implemented, all of these decisions will result in the recovery of more than $800,000. Our goal is to reallocate this money, as well as the laboratories and offices recovered, to strengthen high priority programs and functions." The summary indicated that nine full-time tenured faculty would be terminated. Four were from appellees' program.

In a May 4, 1993 letter to the College's personnel, one of appellees' exhibits at the trial court, President Slowinski wrote in relevant part:

I accepted the recommendation ... to eliminate several programs.... [This] will strengthen the instructional area by allowing Dean Snope to reallocate budget in instruction.... Unfortunately, implement[ion] ... will require associated reductions in personnel....

. . . .

While I do not anticipate the need for "exigency" type actions or "across the board" budget cuts next year, I do foresee a very difficult year. Even with the most optimistic projections, the operating budget will be less than FY 1993. We will continue to initiate every possible cost savings action and to seriously pursue appropriate efforts to "right-size" the college. I believe that even with the budget reductions over the past few years, essential services to our students have not been drastically reduced. Conditions have certainly not been optimal, but administrators, faculty and staff are "doing more with less" to minimize the impact on our students. The president's staff continues to be guided by the principles we forwarded in October, 1991, which encompassed protecting the teaching/learning process, containing costs college-wide and basing priorities on student needs and the centrality of services to the college mission.

Appellees also put into evidence a letter from Dr. Slowinski to a member of the Legislature who apparently had inquired

about the termination of one of the other programs. In relevant part, Dr. Slowinski responded:

You and I are well aware of the difficult economic climate in which we must operate. Understanding the realities of this economy has led all organizations to examine more critically each of its functions and how each is performed. As government must find more cost effective means for providing services, so too must Essex Community College determine the most cost effective means for providing occupational training. We have not abandoned our mission nor our commitment to high quality occupational training. Rather it is the delivery vehicle for certain types of training which will change. Our credit courses in HMRC will be reviewed and repackaged where appropriate to be offered as non-credit courses to the hospitality industry, the same format used in the excellent training program cited in your letter.

The decision to terminate certain degree granting credit programs and the faculty associated with those programs was not arrived at easily nor was it arrived at in secrecy. The decision was the result of an elaborate evaluation process that was designed by the academic divisions and was implemented with their full knowledge and concurrence. In determining which programs would be reviewed this fiscal year, data on enrollment, FTE growth, and average section size over the previous five years were used. Programs which fell below the college averages in these categories were "flagged" for further review. The division chairperson and the faculty in these programs were then given the opportunity to respond to questions regarding the continued viability of the program as a degree granting credit offering. A committee composed of representatives of the college governance bodies and administration studied these responses and made recommendations to the dean of instruction. These recommendations were then shared with the vision chairpersons to provide another opportunity for input. Lastly, the four deans on my staff had their input

before a final decision was rendered. As you can see, the process was collegial, not secretive.[8]

In *Terranova v. Board of Trustees,* 81 Md.App. 1, 13, 566 A.2d 497 (1989), *cert. denied,* 319 Md. 484, 573 A.2d 808 (1990), involving an administrative appeal, we quoted from *Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 399, 396 A.2d 1080 (1979), which referred to Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md. L.Rev. 1, 38 (1964):

> Another commentator presented the following illustration of the operation of the rule:
>
> > [A]ssume that in an agency hearing five witnesses testify on one side of a proposition, and one witness testifies on the other. In its findings, the agency states that it does not doubt the credibility of any of the witnesses, but that it is relying on the testimony of the one witness and disregarding that of the five. Under the substantial evidence rule, a court would be required to uphold such findings.

While *Terranova* was an administrative appeal, what was said there applies to evidentiary assessments generally. If there is conflicting substantial evidence, the trier of fact resolves the evidentiary dispute. Here, there is no evidentiary dispute. Appellees did not proffer one iota of evidence of any reason for their termination other than that proffered by appellant. They relied on their position that they could only be fired for reasons specified in their circa–1970 contract.

We have carefully examined the extract. There is no evidence proffered below that the program was not terminated for financial reasons, or that no serious financial and budgetary problems existed. Appellees argued that they should have been transferred to other departments. That, in part, may be

---

8. The process put in place resulting in the termination of programs due to budgetary restraints eventually caused members of the college faculty, including appellees, to write letters to members of the Legislature questioning the terminations and the process used. It was the Legislature that had authorized the Governor to reduce the budget in the first instance.

   All of the documents mentioned by Dr. Slowinski are indicated in the extract as being before the trial court.

addressed, if appropriate to do so, on remand. They further state that the termination of their department, rather than another, was done for reasons of economics. That is admitted. The law of tenure, as we shall later explain, permits the discontinuance of programs for financial, *i.e.,* economic, reasons. In essence, absolutely no contrary assertion as to the reasons for their termination was ever made. Indeed, the terminations were the end result of a genuine financial crisis resulting from budgetary cutbacks by the funding entities, occasioned by the serious economic situation of the time. This is, therefore, not the case of five witnesses on one side of a proposition and one on the other as discussed in *Terranova.* It is a case of all evidence supporting one position.

■ The general rule is that

we consider the evidence produced at trial in a light most favorable to the prevailing party; and *if substantial evidence is present* to support the trial court's determination, it is not clearly erroneous. . . .

*Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 41, 382 A.2d 564 (1978) (emphasis added). In *Staley v. Staley,* 25 Md.App. 99, 109, 335 A.2d 114 (1975), a paternity case, although affirming a trial court's decision, we noted the presumption of paternity between a husband and wife but then opined:

A person other than the mother and the husband testified, and the parties agreed, that they were living separate and apart during the period of conception. *There was no evidence to the contrary.* Therefore, the record supports the chancellor's finding that the presumption of legitimacy was overcome. [Emphasis added.]

■ In the case *sub judice,* the opposite exists. There is no substantial evidence supporting the factual conclusions of the trial judge. All of the evidence supports the existence of a financial shortfall causing the termination of the program. There was no evidence to the contrary. Even if the trial court totally disbelieved all of the witnesses on the issue of finances, and discounted their testimony, with *no* evidence to the contrary, there was *no* evidence to support the trial court's

finding that a financial crisis did not exist. Were we to hold that, in every instance when all of the evidence is one way, it may all be disregarded and the trial judge permitted to make a finding completely devoid of supporting substantial evidence, merely because he declines to credit the evidence that does exist, then the clearly erroneous rule would be no rule at all. A trial court essentially could never be reversed on its factual finding. We do not believe this to be the law, nor should it be.

In *Burroughs Int'l Co. v. Datronics Eng'rs, Inc.*, 254 Md. 327, 338, 255 A.2d 341 (1969), the Court, after discussing the clearly erroneous rule, quoted from an earlier case, *Goodwin v. Lumbermens Mut. Cas. Co.*, 199 Md. 121, 85 A.2d 759 (1952), the rule that applies when there is no supporting evidence upon which a trial court's factual findings is based: " 'But if there is no such substantial evidence, then the conclusion may be designated as arbitrary, and may be disregarded.' " 254 Md. at 338, 255 A.2d 341.

*Aetna Casualty & Sur. Co. v. Brethren Mut. Ins. Co.*, 38 Md.App. 197, 379 A.2d 1234 (1977), involved the legal meaning of the term farm or farming in an exclusion clause in an insurance policy and also whether the facts before the trial court supported the trial court's finding that the incident was not within the ambit of the exclusionary clause. As in the case *sub judice*, there was only one set of facts, *i.e.*, there were no contrary or disputed facts. One of the parties in the underlying case, the Bonifaces, operated a farm, the major portion of which was used for the breeding and training of race horses. One of their horses escaped and was involved in a collision with an automobile, causing injuries to its occupants. Boniface was sued for negligence. The dispute between the appellate parties involved an Aetna policy that had an other *insurance* clause. Boniface, at the time, also had a policy with Brethren. The policy with Brethren had a clause that excluded liability for "farming" activities and other provisions. We stated:

> In a declaratory judgment proceeding, the trial court may sit ... as the trier of the facts, and its conclusions as to the facts will not be disturbed unless found to be clearly errone-

ous.... [T]he [trial] court ... was required to resolve the factual dispute as to what the intended coverage of the Brethren policy was. It therefore becomes our task to examine the factual conclusions of the trial court and determine whether ... they were clearly erroneous.

38 Md.App. at 206–07, 379 A.2d 1234. The Court then discussed certain traditional interpretations of "farming." We then noted:

> The trial court ... chose to rely upon the dissenting opinion in ... *Wint [v. Fidelity & Casualty Co.,* 9 Cal.3d 257, 107 Cal.Rptr. 175, 507 P.2d 1383 (1973) ], where it was stated "that the activities of the insured ... had nothing to do with farming ... but were part and parcel of his business of operating a riding academy and boarding stable."

*Id.* at 209, 379 A.2d 1234. We then discussed several Maryland cases that held that permitting neighbors to graze cattle required that the property be classified as a farming property for the purpose of tax assessments, (*Supervisor of Assessments v. Alsop,* 232 Md. 188, 192 A.2d 484 (1963)) and that concerned whether a dairy farm employee was a farm laborer, (*Keeney v. Beasman,* 169 Md. 582, 182 A. 566 (1936)). We concluded by holding:

> Our examination of these authorities and of the facts in this case convinces us that ... a substantial portion of the activities ... should be characterized as farming....
>
> ... [T]he brood mare, Sasal, was kept ... for breeding purposes only, that she never raced, nor was she ever in training for racing.... [S]he was barren and was therefore kept in a pasture away from mares in foal. It was from this pasture that she escaped.... [G]razing activity "can reasonably be interpreted to constitute a farming operation".... [H]er pasturing was, we believe, a farming activity. When we apply the requirement that the ambiguity in this case be resolved against the company ... we [still] have no difficulty in [finding for the company] reaching the conclusion that the trial court was clearly erroneous in its

factual conclusion that this incident was not covered within the meaning of the [farming] exclusionary clause. We shall reverse.

38 Md.App. at 213–14, 379 A.2d 1234. In *Aetna,* there was some contrary evidence, *i.e.,* that it was a race horse training business rather than a farming activity. In the present case, there is no evidence that contradicts the evidence that the appellees were terminated because the program had been terminated and that the program had been terminated for financial reasons.

While the facts in *Aetna* involved construing exclusionary language in insurance policies, etc., instead of tenure terminations, the posture of the case in *Aetna* and the present case are very similar, *i.e.,* the real issue arising from the trial court was thus not a factual *conflict* but an interpretation of the facts, *i.e.,* a factual conclusion. With the facts in the case *sub judice* being uncontradicted by any substantial evidence, the contrary factual conclusions of the trial court were arbitrarily made and, accordingly, are clearly erroneous. We explain further.

The evidence of severe financial cutbacks in the case *sub judice* is clear. While appellees objected below to the admission of this evidence, and while the trial court commented that it probably should have sustained those objections because of its belief that this issue was belatedly presented, it did not sustain the objections, and the evidence was admitted. Moreover, the trial court resolved the issue based upon its interpretation of that evidence. Under Maryland's community college scheme, the State and the county, or counties, provide a significant amount of the funding to the community colleges. There was uncontradicted evidence that the State reduced its contribution by twenty-five percent—an unarguably serious reduction. There was also evidence of substantial reduced funding by the county. The existence of a financial crisis was apparent.

In addition to that evidence introduced below as to what occurred in the college's termination and grievance proce-

dures, the deposition testimony of Dr. Slowinski, the President of the college, was first read into the record in the circuit court by appellees:

"Question: Now, in reviewing that, is it correct that neither of the individuals mentioned in that finding, which would be Jane Adams and Gwen Nicholson [,appellees], that neither of them were being terminated for immorality, dishonesty, misconduct in office, incompetency, insubordinance in or willful neglect of duty? Isn't that correct? Answer: That is correct. Question: Now, sir, have you reviewed their contracts? Answer: Yes. Question: Can you tell me what clause permits you to recommend over the recommendation of the Faculty Grievance Committee to infer a clause, a clause that sticks into that contract the term, an inference of closing of a department? Answer: I accepted the interpretation that it was implied. Question: That it was implied? Answer: Yes. Question: Is it your position that the only reason that they are being terminated was a contract reason, is that correct? Answer: That's correct. Question: The only reason that you are stating that they can be terminated is because you are implying that clause into their contract, isn't that correct? Answer: We are terminating the program and implying that the contract, in fact, does provide that."

In addition to Dean Snope's testimony at the college level hearing, Dr. Joseph Testa, the Associate Dean of Instruction, was permitted to testify at trial:

Q.  ... [D]id there come a time when the college began to experience financial difficulties in the budget area?

. . . .

A.  The college was experiencing financial difficulties at that time.

. . . .

A.  It came about because of serious cutbacks from the State of Maryland and Baltimore County which makes up a substantial part of the college's overall *operating budget.*

. . . .

A. The State reduced the college's budget from the State by 25 percent. It amounted to several million dollars.... Much has been made about the fact that the college was not in a situation of financial exigency. That is correct. Technically, it was not. Financial exigency would have meant that there was simply not enough money to pay all of the college's bills. We were not in that situation. What we were in was a serious financial crisis in which there had been—there was no money for equipment. There was declining money for supplies. We were facing enrollment growths and yet a dramatic decrease in income.

. . . .

A. ... The financial problems existed throughout the college, but heavily impacted throughout instruction because that's where the bulk of the expenses are. [Emphasis added.]

There was uncontradicted testimony of attempts made to resolve the crisis—including the ultimate termination of instruction. Dr. Testa stated:

[Appellant's attorney]: Was a financial exigency ever declared by the Board of Trustees?

A. No.

Q. Did the President ever ask the Board to declare a financial exigency?

A. No, sir.

Dr. Testa then testified at trial as to how the college attempted to deal with the financial crisis:

A. Dean Snope would then meet with the Associate Deans and the Division Heads as necessary to let us know what was happening at the President staff level and how the college would be dealing with the financial shortfall.

. . . .

Q. As a result of these meetings, was certain action taken in connection with the budgetary situation that the college found itself in?

A. Dean Snope had said that we would be unable—it appeared that this financial crisis was not a one-time situation and that we would likely be experiencing these cutbacks from the State and the County for some period of time. That if we were to continue to grow, as indeed our enrollment was growing at the time, we would have to be able to put money into supplies, materials and equipment. We could not continue to go the way we had been with so little money in that area. As a result he asked that the division Chairman come up with a plan by which all programs could be reviewed in the instruction function to determine their continued viability at the college.

Q. And how did the Division Chairs respond to the charge?

A. They accepted that charge. They met. They formed a subcommittee of their own and sometime in 1992 came up with a document known as Four Flags For Andy.

. . . .

Q. How was this document used?

A. When Dr. Snope received it, I believe he had sent it to the various governing bodies at the college and asked for their input before any of it was ever implemented.

Q. Specifically, identify the governing bodies there are on the campus.

A. The Faculty Senate, the Academic Council and the Administrative Forum.

. . . .

Q. And did there come a time when you were part of the committee that the Dean appointed to implement this process?

. . . .

A. . . .

What we did at that point there was a committee composed of representatives of administration and faculty and there was a process in here by which we were to get information from the flagged departments. That process

began in the fall of 1992, but what had happened having been a member of that committee, I remember quite vividly we were not getting consistent information. The original process had called for the departments or the programs to give us information. The problem was that we had information from the Research Office that told us these programs were in trouble and some of the programs were denying that they were in trouble. So, we were unable to make any heads or tails out of that. We asked the Dean rather than have the process as I have just described it, why don't we, the college, provide the information that we have to the departments and ask them to respond. That way at least we are all on the same page. That was agreed to. Therefore, the process basically began over again in the spring of 1993.

. . . .

A. No, the recommendations were based on what the committee thought was the continued viability of the program based on the answers that the committee had received to the questions that had been asked of the various programs.

Q. Okay.

A. I mean, the committee was not concerned if programs were cut, are we going to have "X" dollars. That was not our concern. We were going to look at the continued viability of the programs. We wanted to see if they should have continued, discontinued or modified.

. . . .

[Appellant's attorney]: As a result of the recommendations of your committee, certain programs and transfer disciplines were eliminated, correct?

A. That's correct.

[Appellees' attorney]: Objection. Leading.

THE COURT: Overruled.

. . . .

Q. Did Dean Snope ever share with the Division Chairs the possibility that out of the Four Flags Review process would come termination of tenured faculty?

A. Yes, he did.

The trial court again considered denying the admissibility of evidence relating to the college's financial condition when Dr. Snope, Dean of Instruction, testified but ultimately decided to admit the testimony. The in-court testimonial exchange involving Dr. Snope included the following:

Q. Now, I would like you to describe to the Court the financial problems that occurred at the college beginning in 1991 and continuing thereafter, and describe for the Court just briefly how they arose and how they affected the instructional programs at the college that you as Dean of Instruction are supervising.

[Appellees' attorney]: Objection as to relevancy.

THE COURT: All right. The objection is noted. I am going to permit him to testify even in light of the Court's comments that the Court does not believe that it was pleaded as required.[9] Again, as I think I said last week, I am going to let all the testimony in so the Court of Special Appeals or the Appellate Court has all the facts with which to rule.

It is thus clear that the trial court had determined to resolve this case in a manner that would permit us to address fully the issue of the viability of tenured professors when institutions are faced with serious financial problems.

Dr. Snope then testified:

A. In 1991, the college experienced its first of a series of major budget reductions when the State as[k]ed for well over one million dollars back and it was evident at that point that that was the beginning of a long series of budget cuts

---

9. Appellant's Motion to Dismiss the amended complaint was denied on May 24, 1995. Appellant then filed an answer on approximately June 12. It was, therefore, filed three to five days late. That answer was later amended.

that would occur at the State as well as the County level. In response, the college had to take a series of actions in order to be able to pay the bills. We had to cut our budget for supplies and equipment. We had to furlough all college employees. We had to cut other programs such as a special program of the steps that the college was forced to take over the last three years beginning in 1991 when the first of a series of budget cuts occurred.

Q. Were these budget cuts ever restored?

A. No, they have not been.

Q. Now, among the approaches considered by the college, was the reduction in academic programs correct?

. . . .

A. In the fall of 1991, my response to budget cuts was to begin a process of program evaluation because it became evident at that point that we probably would not be able at the college to continue to do everything we had done in the past.

Q. And how was this process implemented?

A. The process was begun by my asking the heads of the academic divisions to establish and to recommend a process by which all programs and disciplines within the college could be reviewed in a relatively short time period with the objective of being able to reach decisions about the continued viability of those program areas.

. . . .

[Appellant's attorney]: Dr. Snope, why wasn't the Board ever asked to declare a financial exigency?

[Appellees' attorney]: Same objection.

A. A financial exigency is a last resort. It is extreme action that involves laying off staff when there appears to be absolutely no other way to pay the bills. A state of financial exigency was not asked for because it was possible for us to make ends meet through all of the other steps that we implemented in response to very severe financial difficulties which exist to this day.

Q. And as a result of the decisions that were made through the Four Flags process, did there come a time when programs and positions at the college were terminated in 1993?

A. Yes.

Q. And did there come a time when you met with both of the [appellees] and the other members of the Office Technology program to advise them of these terminations?

A. Yes.

Q. That was April 29, 1993?

A. Yes, it was.

■ There was virtually no evidence contradicting the testimony of Dean Testa and Dr. Snope at trial, or the documents generated by the procedures before the college's governance entities that were later admitted in evidence. There was no *evidence* presented at the college's governance or grievance levels to the contrary. It was clearly erroneous to find that the institution was not faced with serious financial problems. There is simply no substantial evidence supporting the trial court's factual conclusions. Having found that the trial court's factual conclusions were clearly erroneous, we are required to address the underlying law of tenure.

Before doing so, we first comment that whenever a longtime, faithful, competent person, who has devoted large portions of his or her career to a particular vocational endeavor, is, through no fault of his or her own, laid off or terminated, we experience great sympathy for what occurs. The State employees in *Maryland Classified,* the poor whose support system was reduced in *Judy,* and the highly competent professors in the case *sub judice,* all suffered because of events beyond their control. There can never be anything other than sympathy as to the unwarranted misfortune of any litigant. We must, however, base our decisions on the law, unaffected by our sympathy and personal feelings. To that end, in jury trials, we ordinarily admonish jurors as follows:

You must consider and decide this case fairly and impartially. All persons [including corporations] stand equal

before the law and are entitled to the same treatment under the law. You should not be prejudiced, for or against a person because of that persons ... political or social views, wealth or poverty. *You should not even consider such matters.* The same is true as to prejudice, for or against, *and sympathy for any party.*

Maryland Civil Pattern Jury Instructions 1:6 (2d ed. 1984) (brackets in original) (emphasis added). That with which we admonish jurors is an admonishment to us as well. We are constrained to follow what we perceive to be the law, not what we know to be our sympathies.

We next consider one of our recent tenure cases.

*Johns Hopkins University*

*v.*

*Ritter,*

114 Md.App. 77 (1996).

*Ritter* involved the issue of whether tenure had been awarded. It did not involve the termination of tenure. As *dicta*, we did state, in a section devoted to interpreting tenure, that

it denotes a commitment by the school, as a direct or implied part of its faculty employment agreement, that, upon a determination that the faculty member has satisfied the conditions established by the school, the member's employment will be continuous, subject to termination only for adequate cause.

114 Md.App. at 80–81, 689 A.2d 91.

That statement correctly states the law of tenure as we understand it and as the majority of other jurisdictions understand it when a tenured professor is terminated for some reason personal to him or her specifically. As we shall show, however, that statement is not applicable when tenured professors are terminated for grounds not personal to them. Termination motives not personal to individuals may provide adequate reasons for termination of persons with tenure.

Moreover, *Ritter*, as we have indicated, as well as *Marriott v. Cole*, 115 Md.App. 493, 694 A.2d 123 (1997), concern the "awarding" of tenure, not the termination of tenured faculty.

## THE LAW OF TENURE TERMINATION

### *Cearfoss* and *Krotkoff*

The only State case we have discovered that mentions the termination of tenured teachers for nonpersonal reasons was actually decided based upon the interpretation of a statute, not the happening of events causing a termination for nonpersonal reasons. Its discussion, however, is helpful to our consideration. In *County Bd. of Educ. v. Cearfoss*, 165 Md. 178, 166 A. 732 (1933), the Court opined, in reference to the teachers' contracts of employment, that

> the contracts with the teachers evidently designed that they might rely, after the first year, upon a tenure to continue until abrogated for sufficient cause. It would not be proper, however, to construe the contract as tending to assure to the teachers a permanency of employment. The officials in charge of the public school system[10] would have no authority to assume for it the financial burdens which might result from such a contractual obligation. Changing conditions, such as the abandonment of certain courses of instruction, or the consolidation of schools, might reduce the number of positions for which teachers are required. In such an event a teacher thus affected, whose tenure is of indefinite duration, could not rightfully demand payment for services not needed nor actually rendered.

*Id.* at 188, 166 A. 732. Although the decision in *Cearfoss* was based on other grounds, the Court's considered statement expresses a view that is supported by the majority of authority elsewhere.

---

10. Community colleges are public institutions, primarily funded by governmental entities. The law of tenure, however, may be the same, or very similar, in respect to private educational institutions that award tenure.

Another relevant case, this one, relied on extensively by appellant, *albeit* a federal case, concerned a private Maryland college. In *Krotkoff v. Goucher College*, 585 F.2d 675 (4th Cir.1978), a college professor brought suit against the college alleging that it had violated her tenure when it discharged her. The college contended that it terminated her employment as a "part of a general retrenchment prompted by severe financial problems." *Id.* at 676. The college notified Krotkoff in June of 1975 that it would not renew her contract in June of 1976 "because of financial problems." [11] *Id.* at 677. The serious "financial situation[, caused by substantial operating deficits,] convinced the trustees that action was needed to insure the institution's future." *Id.*

As a part of its retrenchment, the college did not renew the contracts of [eleven] untenured and four tenured faculty members including Krotkoff. These professors were selected largely on the bases of the dean's study of enrollment projections and necessary changes in the curriculum. In addition, the faculty elected a committee to review curricular changes suggested by the administration. Among the administration's proposals were elimination of the classics department and the German section ... which were staffed exclusively by tenured professors.

*Id.* at 677–78.

Following a study of enrollment projections, it was determined that only one position would remain in the German section of the modern language department. Krotkoff, a German faculty member, was terminated, while the other professor in the German section was retained because she had experience with elementary language courses and because she was also qualified to teach French. *Id.* at 678. A faculty grievance committee recommended Krotkoff's retention but did not suggest that the other professor be terminated. The president did not accept the committee's recommendation, and the trustees sustained the president's decision.

---

**11.** It was acknowledged that Krotkoff, like the appellees in the present case, had been a fine teacher and that she was not being terminated because of any performance or behavioral problems.

The court framed the issue as "whether as a matter of law Krotkoff's contract permitted termination of her tenure by discontinuing her teaching position because of financial exigency." *Krotkoff,* 585 F.2d at 678. The tenure bylaws of the college provided for "continued service unless good cause be shown for termination." *Id.* The court noted that "[f]inancial exigency is not mentioned in the by-laws, and the college concedes that it is not considered to be a ground of dismissal for cause." *Id.* (footnote omitted). In its discussion, the court noted that the national academic community's understanding of tenure acknowledges that a tenured professor may be terminated because of financial necessity—so long as the necessity is "bona fide." The court discussed that termination of tenured professors was appropriate under two circumstances—the first being for cause and the second included "financial exigency." It also commented on a witness's reliance on a 1940 Statement of Principles on Academic Freedom and Tenure and noted that the statement recognized that termination for financial exigency was permitted so long as the financial exigency was demonstrably bona fide. The court, referring to this statement, said:

> [A]ll of the secondary authorities seem to agree that it is the "most widely-accepted academic definition of tenure." Brown, Tenure Rights in Contractual and Constitutional Context, 6 Journal of Law and Education 279, 280 (1977).

> The reported cases support the conclusion that tenure is not generally understood to preclude demonstrably bona fide dismissal for financial reasons.... [W]here the contracts did not mention this term, the courts construed tenure as implicitly granting colleges the right to make bona fide dismissals for financial reasons. No case indicates that tenure creates a right to exemption from dismissal for financial reasons....

> A concept of tenure that permits dismissal based on financial exigency is consistent with the primary purpose of tenure. Tenure's "real concern is with arbitrary or retaliatory dismissals based on an administrator's or a trustee's distaste for the content of a professor's teaching or research.... Dismissals based on financial exigency, unlike

those for cause or disability, are impersonal; they are unrelated to the views of the dismissed teachers."

*Id.* at 679–80 (citations omitted).

The court then noted that Goucher College's bylaws and the other relevant documents did not define the rights of tenured professors during financial exigency and that the tenured teachers believed that tenure precluded their dismissal for financial reasons. The court then stated that, in assessing whether the financial exigency was bona fide, it was improper for a fact finder, *i.e.*, a trial court, to consider a college's land holdings or endowment, in that choices as to retention of land or usages of endowments were the proper business of the college and not the courts. It concluded: "[T]he existence of financial exigency should be determined by the adequacy of a college's operating funds rather than its capital assets." *Id.* at 681.

In respect to whether Krotkoff, or some other professor, should have been terminated, the court looked to Krotkoff's contract. It held that Krotkoff was entitled, under her contract, to insist that Goucher *"use reasonable standards in selecting which faculty appointments to terminate,* and ... that it take reasonable measures to afford her alternative employment." *Krotkoff,* 585 F.2d at 682 (emphasis added). The court, nevertheless, ultimately held:

> The necessity for revising Goucher's curriculum was undisputed. A faculty committee accepted elimination of the classics department and reduction of the German section ... as reasonable responses to this need. The only substantial controversy was whether the college should have retained Krotkoff or Ehrlich, both tenured professors....
>
> ... [I ]n the absence of an explicit contractual undertaking, the evidence discloses that tenure does not entitle a professor to training for appointment in another discipline.

*Id.* at 682 (emphasis added).

### Foreign Case Law

*Christensen v. Terrell,* 51 Wash.App. 621, 754 P.2d 1009 (1988), was a case in which across the board budget reductions

imposed by the governor resulted in the termination of tenured faculty members at Washington State University. The court noted:

[T]he Fourteenth Amendment requires only those procedures which are necessary to provide the tenured teacher a fair opportunity to show that his or her termination or layoff was for a constitutionally impermissible reason, or was wholly arbitrary or unreasonable. . . .

. . . .

. . . [S]trict adherence to the University's written procedures is not required as long as the minimal due process requirements of federal constitutional law are met.

*Id.,* 754 P.2d at 1014–15.

Much as in the case *sub judice,* a trial court in *Refai v. Central Washington Univ.,* 49 Wash.App. 1, 742 P.2d 137 (1987), ordered the college to reinstate a professor whom it had terminated for financial reasons and awarded him back pay. There, as here, the legislature made drastic cutbacks in the funding of the college ($3,584,000). At first, nontenured faculty members were terminated, but the legislature again reduced the appropriations for the college. The college publicly notified the faculty and others of the seriousness of the financial problems. A Faculty Senate Executive Committee confirmed the existence of a serious financial problem. That committee then selected departments and programs to be reduced or curtailed. It determined that ten faculty positions needed to be eliminated. The president of the university reduced the number of faculty cuts to seven. The proposed layoff plan was then presented to the academic community for input. Ultimately, the president notified those who were to be laid off. Refai was among those notified. He then demanded and received the hearing process and then appealed to the trial court, which ordered him reinstated with back pay.

Refai argued that he was terminated not for financial reasons, but because the college wanted to eliminate "programs which were obsolete, nontechnological, and nonlucrative." *Id.,* 742 P.2d at 142. In reviewing the trial court's decision, the

Washington intermediate appellate court commented "that courts should exercise caution when reviewing this type of decision. '[W]here lack of funds necessitate[s] releasing a sizeable number of the faculty . . . it [is] peculiarly within the province of the school administration to determine which teachers should be released, and which retained.'" *Id.,* 742 P.2d at 142 (quoting *Klein v. Board of Higher Educ.,* 434 F.Supp. 1113, 1118 (S.D.N.Y.1977)). The court later noted, quoting certain commentators, that

> [a]llowing courts or faculty members to second guess the response of university administration to a bona fide financial crisis would serve to protect neither the financial stability of the institution nor the academic freedom of the faculty. . . . [I]f the institution's decision to terminate a tenured faculty member was caused by financial exigency and the university has no . . . improper motive for the termination, then the question of whether the termination was the best response under the circumstances is a purely administrative one.

*Id.,* 742 P.2d at 142 (quoting Bolger & Wilmoth, *Dismissal of Tenured Faculty Members for Reasons of Financial Exigency,* 65 Marq. L.Rev. 347, 355–56 n. 35 (1983)). In respect to due process concerns, the *Refai* court opined:

> [W]e observe that the Fourteenth Amendment does not require that Dr. Refai have the opportunity to respond prior to the decision to lay off specific individuals. . . . To determine the required procedural safeguards, we must weigh the following factors: (1) the private interest in retaining employment; (2) the risk of erroneous termination; and (3) the government interest, including the fiscal and administrative burdens that additional or substitute procedures would entail.

*Id.,* 742 P.2d at 145–46 (citations omitted). It addressed those issues by noting:

> Because Dr. Refai's termination was not due to allegations of misconduct, the reasons for requiring a pretermination hearing are not as compelling. . . . [W]e do not believe the risk of erroneous termination is as serious as it is in cases

such as [*Cleveland Bd. of Educ. v.*] *Loudermill* [,470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)] where an employee is discharged for some type of misconduct. Although a pretermination hearing serves the important purpose of providing an "initial check against mistaken decisions," it has limited use where the termination was caused by financial exigency.

*Refai,* 742 P.2d at 146.

A case also similar to the instant case was *Graney v. Board of Regents,* 92 Wis.2d 745, 286 N.W.2d 138 (1979),[12] in which the court gave an extensive discussion of cases involving the termination of a tenured professor as a result of an institution's financial problems. In that case, the Board of Regents, faced with a legislative limitation on funding, initiated measures resulting in the dismissal and layoff of tenured faculty members. There, as relevant to the case at bar, the Regents did not have any *express* authority to terminate tenured faculty based upon financial exigency. The court, nevertheless, opined:

The Board of Regent's authority to terminate employees for reasons of financial exigency is not expressly granted by the statutes. However, this authority is implied under the general powers of the board for state universities ... which provide that, "the board of regents shall possess all other powers necessary or convenient to accomplish the objects and perform the duties prescribed by law."

. . . .

Several jurisdictions have recognized that educational governing boards possess an inherent authority to discharge tenured faculty for reasons of financial exigency which is distinct from the authority to discharge for cause. *Funston v. District School Board,* 130 Or. 82, 278 P. 1075 (1929); *Downs et al. v. Board of Education of Hoboken Dist.,* 13 N.J.Misc. 853, 181 A. 688 (1935); *Ehret v. Kulpmont Bor-*

___

12. This case was decided primarily on sovereign immunity grounds. The court, however, also addressed the merits in respect to several of the contentions made by Grancy.

*ough School District,* 333 Pa. 518, 5 A.2d 188 (1939); *State ex rel. Frank v. Meigs County Board of Education,* 140 Ohio St. 381, 24 Ohio ops. 303, 44 N.E.2d 455 (1942); *Miller v. Stoudnour,* 148 Pa.Super. 567, 26 A.2d 113 (1942); *Appeal of Ritzie,* 372 Pa. 588, 94 A.2d 729 (1953); *Levitt v. Board of Trustees of Nebraska State Colleges,* 376 F.Supp. 945 (D.Neb.1974); *cf. Browzin v. Catholic University of America,* 174 U.S.App. D.C. 60, 64, 527 F.2d 843, 847 (1975); *Krotkoff v. Goucher College,* 585 F.2d 675 (C.A. 4th Cir. 1978); *Steinmetz v. Bd. of Trustees, etc.,* 68 Ill.App.3d 83, 24 Ill.Dec. 604, 385 N.E.2d 745 (1978).

286 N.W.2d at 145–46 (footnote omitted) (some citations omitted).

In *Rymer v. Kendall College,* 64 Ill.App.3d 355, 20 Ill.Dec. 880, 380 N.E.2d 1089 (1978), a tenured professor was terminated because the course he taught was being discontinued in light of declining enrollment. Rymer contended that the actions of the college were improper and constituted a breach of his contract because they were "inconsistent with the terms of the policy manual relating to tenure." *Id.,* 20 Ill.Dec. at 881, 380 N.E.2d at 1091. Among his contentions at trial was that the action was improper because it was not based on "financial exigencies, insufficient funds, decreased enrollment or discontinuation of particular courses." *Id.* On appeal, he apparently framed the issue, relevant to our inquiry, as "the only possible grounds [for terminating a tenured teacher] would be cause, age or *bona fide* financial exigencies of the college.... [H]e argues that there is or ought to be a public policy or common law concept of tenure that would bar dismissal in the absence of these grounds." *Id.* The court found that the specific reason for Rymer's termination was discontinuance of a particular course of instruction and affirmed his dismissal.

In *Levitt v. Board of Trustees,* 376 F.Supp. 945, 952 (D.Neb. 1974), a case in which, like the instant case, the State drastically reduced the budget of the state colleges, the court opined: "The plaintiffs are not guaranteed any absolute constitutional right to continued employment. Plaintiffs['] tenure

rights do not guarantee them continued rights to public employment." (Citations omitted.) *See also Browzin v. Catholic Univ.*, 527 F.2d 843 (D.C.Cir.1975) (holding there was no breach of contract when university dismissed a tenured professor due to the elimination of certain courses that was necessitated by financial problems); *Johnson v. Board of Regents*, 377 F.Supp. 227 (W.D.Wis.1974) (upholding termination of tenured professors based upon financial exigency), *aff'd without op.*, 510 F.2d 975 (7th Cir.1975); *Rose v. Elmhurst College*, 62 Ill.App.3d 824, 19 Ill.Dec. 919, 922, 379 N.E.2d 791, 794 (1978) (holding that dismissal of a tenured college professor was proper when the department in which he taught was curtailed as "a direct consequence of declining enrollment"); *Sacchini v. Dickinson State College*, 338 N.W.2d 81, 86 (N.D.1983) ("Dismissals based on financial exigency are impersonal and are unrelated to the views of the dismissed teacher."); *cf. Rehor v. Case Western Reserve Univ.*, 43 Ohio St.2d 224, 331 N.E.2d 416 (upholding termination of tenured professor at age sixty-eight even though the retirement age at the time the professor was hired was seventy), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 390 (1975).

Appellees never proffered below that they were being terminated for their views or opinions; for making any statements; for criticizing the school administration, the college or its students; for any participation in college or activities outside of college; or for holding any political, governmental, educational, or social views contrary to those held by the college administration. No interference with the expressions of their views or with their activities was ever alleged.

There are also a number of cases dealing with the dismissal of tenured teachers at the primary and secondary school levels. In *State v. Board of Educ.*, 213 Minn. 550, 7 N.W.2d 544 (1943),[13] the court stated:

---

**13.** This case deals with a number of tenure-related issues.

The administrative officers of our school system should not, by judicial interpretation of the law, be converted into mere robots and deprived of all right honestly to determine matters of policy in the administration of school affairs.

. . . .

. . . ". . . Where an administrative officer is vested with discretion to determine a particular question of policy, that discretion cannot be exercised for him by the courts. His decision is final upon the question of policy."

. . . .

The propriety, justice, wisdom, necessity, utility, and expediency of rules and policies adopted by a school board are exclusively matters for the board to determine. . . .

. . . .

Our teachers should be the first to recognize that the tenure law was not intended as a guarantee of continuous employment during good health and good behavior, regardless of whether the number of pupils or the availability of positions justifies their continued retention. . . .

. . . .

. . . [W]here the school board has properly determined that the right to discharge two or more teachers exists by reason of such cause or causes [discontinuance of a position or lack of pupils], it is a question of administrative policy how the right or power shall be exercised.

*Id.,* 7 N.W.2d at 555–58. In *Bates v. Board of Educ.,* 133 W.Va. 225, 55 S.E.2d 777 (1949), the teacher, who had a continuing contract of employment, sought mandamus relief. The court, upholding the dismissal of the teacher based upon a lack of need for his services, opined:

[T]he board determined to dispense with the services of petitioner, in order that a person qualified to teach courses other than industrial arts could be employed. . . .

. . . .

. . . In the very nature of things, situations frequently arise where competent teachers exceed the demand for their

services, and it would be strange indeed if a board of education lacks the power to dispense with the services of teachers who are not needed. . . . [I]n a case where, in seeking to improve the efficiency of a school, it becomes necessary to dispense with the services of a particular teacher, this Court is not inclined to substitute its judgment for that of the board of education.

*Id.,* 55 S.E.2d at 779–80.

In the older case of *Miller v. Stoudnour,* 148 Pa.Super. 567, 26 A.2d 113 (1912), a financial necessity (the district had reached its debt limit) resulted in the school district having to terminate one teacher. Because of an anticipated decline in enrollment in the science department, the school board eliminated one position in that department. Because Miller had been the last teacher hired in that department, he was terminated in spite of his tenured status. The court noted that the evidence supported the financial necessity and that "Courts must assume that persons holding responsible public positions act in good faith, until the contrary is shown." *Id.,* 26 A.2d at 114. It ultimately held that

[a] school board may abolish, discontinue, or reorganize a department for financial reasons. . . . If plaintiff must be retained under the[se] conditions . . . then the board has no control over the school district's finances or over school policy.

*Id.* The Court went on to hold that even the grievance procedures that then existed did not apply because there were no charges against the plaintiff, there had been no attack upon his character or fitness, and there had been no discrimination. Consequently, no hearing was required as the board, in eliminating a separate science department and reorganizing the courses of study because of financial necessity, was acting within its power and authority to control educational polices and the finances of the school district. *See also Woods v. Board of Educ.,* 259 Ala. 559, 67 So.2d 840 (1953) (denying mandamus relief requested by tenured teachers at the secondary school level when the number of teachers had to be

reduced due to declining enrollment); *Fuller v. Berkeley Sch. Dist.*, 2 Cal.2d 152, 40 P.2d 831 (1934) (upholding dismissal of a tenured teacher of a specialized program due to a policy decision to terminate or reorganize the program or the positions).

### Holding

■ We hold that a tenured professor may be terminated when the reasons are not personal to the teacher, but are created by 1) the necessary or preferred discontinuance of courses or programs; 2) declining enrollment that alleviates the need for programs; or 3) when financial problems result in the necessity for termination of programs, positions, or courses. As long as the process of selecting the person(s) to be terminated complies with any institutional requirements and is otherwise fair and reasonable, such terminations are matters of policy and generally not the business of the judiciary. In the case *sub judice*, the evidence was uncontradicted that the college was in a condition of serious financial difficulty, as reflected by drastic reductions in its budget caused by State and county cutbacks. To the extent the trial judge found otherwise, his factual conclusions, as we have said, were clearly erroneous.

The trial judge found:

Therefore, the only reason that can possibly be set forth, and the Court finds that it was set forth at the eleventh hour[14] when [appellant] became in somewhat of a desperate situation to substantiate the termination of these two individuals, is that there was some trouble or problems with regard to the institution. Now, again, I am not sure that I should have permitted the testimony with regard thereto, but I did. I find as a fact that there is absolutely nothing to support the testimony that has been presented and to the

---

**14.** As we indicate earlier, this evidence was known to the parties at the earliest hour. We have no doubt but that the trial court would have benefited had the complete framework of this controversy been fully presented at its initial stages.

contrary, all indications whatsoever with regard to the termination of these two individuals had nothing whatsoever to do with financial problems or circumstances.

As late as February 16, 1994, Dr. Snope indicated in [appellees'] exhibit number nine that there was never any declaration whatsoever of a financial exigency at this institution. The termination letters that were sent to the two individuals in this case made no mention whatsoever of any financial problems that were being considered by the college itself. For them to suggest that there were some discussions is contrary to the evidence that has been submitted to this Court. If, in fact, I agree with the premise that tenure does not give these two individuals a lifetime contract, but, in fact, if the Board of Trustees had a problem, has financial difficulties that are such that would require the termination, then they have to proceed in a proper manner to terminate these two individuals. The record before me is completely devoid that the Board of Trustees in any way, shape, or form intended to terminate these two people for financial reasons. The Board's actions were, in fact, illegal and to the detriment of these two individuals.

■ That factual conclusion is simply wrong. The trial court mistakenly assumed that a serious financial crisis could not exist unless the college formally declared a "financial exigency." As is clear from the testimony, a declaration of financial exigency was the last step in the process of dealing with a financial crisis at this institution. The steps taken by the college were intended to avoid the necessity of declaring a financial exigency. The evidence supports no other conclusion. The only evidence of reasons for the termination of programs in which appellants taught was the financial crisis that was fostered by reduced funding by the State and county. We repeat, there is no evidence contradicting it. The college was permitted to present its reasons for termination. No evidence of any other reasons was ever sufficiently presented, if at all. As was explained above, the formal declaration of a "financial exigency," as defined by the College, is a last step procedure when insufficient funds exist to pay current bills.

The actions taken by the College were designed to avoid the necessity of declaring an "exigency." They were, nonetheless, indicative of attempts to resolve the present and anticipated financial shortfalls in order to solve the financial problems without the necessity of taking that last step.

The trial judge apparently equated the formal declaration of a "financial exigency" with a necessary step in the existence of a financial crisis sufficient to justify the termination of any tenured faculty. As we perceive the law, that is incorrect. Terminations of tenured faculty were manifestly justified. Which professors or programs were to be terminated were policy decisions for the administrative body of the school.

## DUE PROCESS

We note, however, that the trial court was concerned, as are we, with the nature of the grievance process afforded appellees.

Because the trial court based its decision on what it perceived to be a complete lack of financial problems, *i.e..* no financial exigency, it found no reason for the terminations. That was wrong.. The trial court, however, because of those findings, did not adequately consider or address whether, if the terminations were justified, the process of selection of tenured members for termination was done in compliance with the pertinent policies of the institution. That necessitates that these matters now be considered by the trial court.

In respect to the due process rights of tenured professors, the discussions in two federal cases, one out of the Third Circuit and one from the First Circuit, may be helpful on remand. The first case involves the termination of a tenured professor for cause (sexual harassment). *McDaniels v. Flick,* 59 F.3d 446 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996). McDaniels, a tenured professor at Delaware County Community College, after his termination, filed a section 1983 suit contending that his procedural due process rights were violated. The trial court opined:

But McDaniels appears to argue that, as a tenured professor who had been teaching at the college for 20 years, he deserved more protection than those set forth in *Loudermill* [15]. . . .

It is true that McDaniels had a property interest in his continued employment and perhaps a liberty interest in clearing his reputation of sexual harassment charges. But McDaniels appears to argue that because he is a professor and has been at the college for 20 years, his property interest in continued employment is constitutionally greater than those held by the employees in *Loudermill.* Yet he has not offered any basis on which we could or should distinguish reasonably between the interest of a tenured employee who has worked 20 years and the interest of one who has worked only one year for the same employer and we can conceive of no principled way to distinguish between the two. Arguably, the interest in continued employment may be greater for younger employees who have started only recently because they have potentially more years of employment ahead.

. . . .

Inasmuch as the college did not discharge McDaniels in retaliation for his exercise of First Amendment rights, this case does not implicate free speech issues. Indeed, in his complaint McDaniels does not refer to the First Amendment. Rather, we are concerned with the minimum process due under the Constitution to protect property rights in public employment.

. . . .

In sum, we conclude that only the *Loudermill* pretermination requirements were required here. We therefore find that the trial court's instructions that due process required the college to provide McDaniels with notice and explana-

---

**15.** *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Loudermill was a tenured security guard.

tion of the charges and an opportunity to respond were correct.

59 F.3d at 455–56.

McDaniels predicated the majority of his argument on the adequacy of notice—a matter not a determinative issue in the case *sub judice*. We are remanding to the trial court for consideration of the adequacy of the process afforded appellees, primarily because of our view that, if the grievance procedure is implicated, ten minutes may not be adequate to present appellee's position, a matter not yet determined by the trial court.

The *McDaniels* court also addressed another of McDaniels's assertions:

McDaniels also argues that the district court erred in refusing to allow him to show at trial that the pretermination procedure afforded him was a sham. Essentially, McDaniels' theory is that the college administrators never believed Federici's allegations to be true. Instead, he charges that they pounced on Federici's complaint to get rid of a highly paid professor to save money.  . . .

Although due process requires an impartial decisonmaker before final deprivation of a property interest, *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982), it is not clear that strict impartiality is required at each stage of the process. In situations as the one at hand, there are two stages, pretermination and post-termination, but normally the post-termination proceedings conclusively determined the employee's status. The pretermination hearing merely serves as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. at 1495 (citations omitted).

. . . .

. . . McDaniels had the right to appeal the college's decision to the state court. *See Monaghan v. Board of Sch.*

*Directors of Reading Sch. Dist.*, 152 Pa. Commw. 348, 618 A.2d 1239, 1241 (1992). . . . Moreover, the court may modify or set aside an agency decision if it finds violations of the employee's constitutional rights, an error of law, or that necessary findings of fact were not supported by substantial evidence. Clearly then, even aside from McDaniels' options in his union contract, which procedures he in fact initiated, the state offered him sufficient process to protect his property rights.

59 F.3d at 458–61 (citations omitted).

In *McDaniels,* the court held that the process afforded was sufficient. In *Cotnoir v. University of Maine Sys.*, 35 F.3d 6 (1st Cir.1994), also a section 1983 suit, the court affirmed that Cotnoir's due process rights had been violated. In *Cotnoir,* the issue evolved around whether the professor had granted fifty-three credits to a student who had not attended classes. An investigation was done and a report presented to the institution's president that recommended that Cotnoir be terminated for cause. The president sent a letter to Cotnoir informing Cotnoir that he could meet with the president in order to "clarify your role" prior to action being taken against Cotnoir. The two met and the president questioned Cotnoir. The report was not shown to Cotnoir.

Ten days after the meeting, the president sent Cotnoir a letter terminating him. Cotnoir filed a grievance. The person designated to represent the school in the grievance process met with Cotnoir and Cotnoir's faculty representative three times but held no formal hearing. The designee then recommended that the president's decision to terminate Cotnoir "should not be reversed." Cotnoir then filed a grievance with the college's chancellor. The chancellor's designee limited his consideration to whether the proper procedures had been followed and did not hear the merits of the grievance. The Court opined:

The dictates of *Loudermill* squarely control the present case, and compel us to find that based on the facts appearing in the record, the individual defendants reasonably could

not have believed that their actions satisfied the minimum procedural due process requirements. Cotnoir argues that the individual defendants are attempting to recast their investigation of the charges of academic and administrative impropriety which were alleged against him, into a hearing with respect to these charges, and their decision to fire him. Cotnoir argues that, in fact, he was never afforded a hearing *where he had a fair opportunity to present his side of the story.* Based on the facts now appearing in the record, we agree and find that the individual defendants' after-the-fact recharacterization of their actions fails....

. . . .

... Thus, despite the fact that Connick knew that Randall had recommended termination, and that this action was clearly being contemplated, the individual defendants never provided Cotnoir with any notice of this proposed action. The decision of whether or not to terminate Cotnoir's employment was the very decision which would deprive Cotnoir of his property interest, and the individual defendants reasonably should have known that they were required to provide Cotnoir with notice of their proposed action and an opportunity to contest their contemplated action, so that Cotnoir's participation in the process could be meaningful. *See generally Collins* [*v. Marina–Martinez* ], 894 F.2d [474,] 481 [ (1st Cir.1990) ] (finding that where professor had no reason to believe his tenure was being questioned, and notice of hearing was abrupt and uninformative, officials did not afford professor a real chance to present his side of the story and this violated his procedural due process rights); *cf. Newman v. Burgin,* 930 F.2d 955, 960 (1st Cir.1991) (finding that tenured professor was not deprived of procedural due process when school officials provided professor with notice of proposed action, and a trial-type hearing before a neutral decisionmaker); *Brasslett* [*v. Cota* ], 761 F.2d [827,] 836 [ (1st Cir.1985) ] (finding that former town fire chief was not deprived of procedural due process when he was notified of the possibility of discharge because of alleged improprieties committed while

fire chief, and was afforded ample opportunity to defend his actions and rebut any erroneous allegations).

. . . .

... Cotnoir therefore did not have an opportunity to respond to, or defend himself against the evidence presented. A reasonable official should have known that this failure to explain the evidence against an individual violated one of the basic procedural due process requirements.

35 F.3d at 11–12 (emphasis added) (footnote omitted); *see also* Corinne D. Kraft, McDaniels v. Flick: *Terminating the Employment of Tenured Professors—What Process is Due?*, 41 Vill. L.Rev. 607 (1996).

▮ Presuming, *arguendo*, that terminations of this nature are grievable in the first instance, we would agree that a ten-minute limitation on the presentation of a grievance of any tenured professor challenging a termination at any stage of the process is not the process that is due when such issues are properly grievable. Due process challenges were appropriately made below. The trial judge mentioned them in his findings "[a]s a sideline" but did not base his decision on that issue:

> As a sideline, certainly, the hearing before the Board was a travesty of justice to restrict individuals to a brief period of time to present their side of the case. In this case the time limit that was placed upon [appellees] was so minute that it probably would have been impossible for the [appellees'] attorneys even to have given a brief outline of what they intended to show or prove to the Board. I suggest that the proceedings before me certainly indicate that and certainly it was a violation of the due process of these [appellees'] rights to force them into such a procedure. If I were to have done that to either of [appellees] or [appellant] in this case, I am certain that summarily the Appellate Court would return the case to me with orders that I conduct a proper hearing in order to protect every individual's rights.

In this respect, we agree completely with the trial judge.

▮ Additionally, appellees requested that the trial court declare their rights under their contract with the college.

Because of his resolution of this issue by way of mandamus, he may not have fully declared the rights under the contract. We have been made aware of the existence of a parallel case that is presently being litigated in respect to damages, if any, arising out of the contract. Because we are holding that the trial court erred in its factual conclusions in respect to its judgment of mandamus, we are reversing its judgment. We hold further that under the evidence presented in this case, the college had the authority to terminate. Moreover, we hold that which faculty would be terminated constituted discretionary policy decisions for the administration of the college. So long as the college complied with its practices and procedures, the court would have no business interfering in that process—saving as to the matter of damages if the contracts can be interpreted to permit a claim of damages under the circumstances here present.[16]

The trial court, however, because of its reliance on mandamus, did not resolve the due process issues, although it noted them, as we have said, as "a sideline." We reiterate that, under the circumstances here present, it would be appropriate to remand this matter for the trial court to determine whether, under the college's procedures, appellees were accorded due process in the grievance process. Upon remand, appellant and appellees will be free to argue whether terminations of this nature are grievable in the first instance.

If the trial court were to determine that the issue is not grievable or that, if grievable, the grievance procedures of the college were followed, then, and in that event, it shall find completely for the college. If it were to determine that the selection of tenured faculty to be terminated is grievable and that the selection and termination procedures *of the college* were not properly followed, it shall direct the college to reinstitute the grievance process for appellees. In that process, it shall be presumed that the termination of tenured faculty, under the circumstances of this case, was appropriate.

---

**16.** We do not mean to indicate that damages are, or are not, recoverable, as that question has not been presented in this case.

The only issue to be reconsidered will be whether these specific appellees, as opposed to other tenured faculty, should be terminated.

Accordingly, we shall reverse the trial court's issuance of a writ of mandamus. It was simply wrong. Having found that there was no substantial evidence to support its factual conclusions, we need not address whether, if its conclusions had been correct, mandamus would be the appropriate remedy in the first instance. By our silence on this issue, it should not be understood that we approve the issuance of writs of mandamus directing entities to exercise discretionary powers in any specific fashion or to order the reinstatement of tenured teachers to positions that no longer exist in departments or programs that also no longer exist. Nor do we address whether, in such circumstances, an adequate remedy at law would exist, in that with our holding in this case it is clear that a mandamus action is inappropriate in any event when the termination of tenure results from facts unrelated to the personal qualification and conduct or other personal aspects of the employee.

We note, in closing, that if tenured teachers could force schools to maintain programs, courses, and positions, the teachers would, themselves, be the policymakers—rather than the administrative bodies of the colleges. This is especially pertinent when a college is a publicly supported institution, such as appellant. The institution cannot compel the legislative and executive branches of government to fund programs. In fact, all the legislative and executive branches would have to do would be to legislate the institution out of existence. Moreover, the courts are also ill situated, under the circumstances here present, to compel funding of institutions that are mandated into existence by legislative policy and where that branch of government has the power to abolish the entity it has created if it has the will.

JUDGMENT GRANTING WRIT OF MANDAMUS REVERSED; JUDGMENT ORDERING THE REINSTATEMENT OF APPELLEES REVERSED; JUDGMENT ORDERING BACK PAY TO BE PAID TO APPELLEES

REVERSED;[17] CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID ONE-THIRD BY APPELLANT AND ONE-THIRD BY EACH APPELLEE.

MURPHY, Chief Justice, dissenting.

I agree that, (1) in the absence of a written agreement containing express language to the contrary, and (2) as long as it does not violate due process, a college may respond to a bona fide financial crisis by terminating the employment of tenured professors. Given the factual background and procedural history of this case, however, I am persuaded that the trial judge was not required to accept appellant's tardy explanation for the terminations at issue. I would therefore affirm the judgment of the circuit court. of need, enrollment, duplication, etc., was a candidate for termination.

---

**17.** The award of back pay was erroneous for another reason as well. In light of our decision, we do not address it further.

I agree that, (1) in the absence of a written agreement containing express language to the contrary, and (2) as long as it does not violate due process, a college may respond to a bona fide financial crisis by terminating the employment of tenured professors. Given the factual background and procedural history of this case, however, I am persuaded that the trial judge was not required to accept appellant's tardy explanation for the terminations at issue. I would therefore affirm the judgment of the circuit court.