69 A.3d 494

**SPACESAVER SYSTEMS, INC.**

v.

**Carla ADAM.**

**No. 1797, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

June 27, 2013.

424

Meredith S. Campbell (Fred S. Sommer, Stacey L. Schwaber, Shulman, Rogers, Gandal, Pordy & Ecker, PA, Potomac, MD, Thomas D. Murphy, James A. Mood, Jr., Peter A. Bodner, Murphy and Mood, PC, Rockville, MD), on the briefs, for Appellant.

Brian E. Frosh (Karp, Frosh, Wigodsky & Norwind, PA, on the brief), Bethesda, MD, for Appellee.

Panel: DEBORAH S. EYLER, WRIGHT, JAMES A. KENNEY III, (Retired, Specially Assigned), JJ.

KENNEY, J.

Spacesaver Systems, Inc., appellant, appeals the judgment of the Circuit Court for Montgomery County entered in favor of Carla Adam, appellee, in the amount of $255,868.20. Spacesaver presents four questions for our review,[1] which we have consolidated, rephrased and renumbered as follows:

1. Did the trial court err in finding that the Employment Agreement was not an at-will contract, but rather a for-cause lifetime contract?

2. Did the trial court err in awarding damages where compensation, in the form of either salary or commissions, was not set in the Employment Agreement?

For the reasons that follow, we hold that the Employment Agreement is neither an at-will contract nor a contract for lifetime employment, and that Adam, under the circumstances of the case, could only be terminated for-cause. We shall affirm the award of damages.

## FACTUAL AND PROCEDURAL BACKGROUND

Nineteenth century Russian literary critic Ivan Kireevsky chided that, "[i]n the West, brothers make contracts with brothers." Harold J. Berman, *The Weightier Matters of the*

---

1. As stated in Spacesaver's brief, the questions presented are:
   1. Is an employment contract that does not define a term of employment and contains no special consideration sufficient to establish a right to lifetime employment?
   2. Did the trial court err, in the absence of any evidence of an agreement between the parties regarding the term of employment, in finding that [Adam] is entitled to lifetime employment?
   3. Was the trial court's finding that [Adam] is entitled to an annual salary of $120,000 per year error where the parties and all other witnesses testified that there was no agreement to such a contract term?
   4. Did the trial court err in awarding damages for commissions in the absence of any provision for such compensation in the contract upon which [Adam] sued?

*Law,* in *Solzhenitsyn at Harvard* (Ronald Berman ed., Ethics and Public Policy Center 1980). In this case, siblings and half-siblings saw the need to contract with each other, and the result was, in the words of the trial court, "a family fractured by business problems." This Court is called upon to sort out the essential nature of those contracts, with Spacesaver arguing that Adam's employment contract was at-will, and Adam contending that it was a "lifetime contract" terminable only for-cause.

To be sure, lifetime employment contracts are like exotic, rare birds that have been identified and described in their occasional flights into Maryland, although they have rarely nested in our appellate jurisprudence. Their somewhat illusory nature was expressed by former University of Iowa football coach Hayden Fry when he said: "I thought I had a lifetime contract. Then I found out the other day that if I have a losing season, they're going to declare me legally dead." Ray Yasser, *A Comprehensive Blueprint for the Reform Of Intercollegiate Athletics,* 3 Marq. Sports L.J. 123, 148 (1993).

The background facts are not in dispute. Spacesaver is a Washington, D.C. corporation with 53 full or part-time employees. Its corporate office is in Kensington, Maryland. Spacesaver sells and installs tracked shelving and storage systems for business and governmental organizations with large storage needs. It was formed by Jack and Alice Schmidt in 1973. A Voting Trust Agreement gives each of the Schmidts' three children, Carla Adam, Amy Hamilton and David Craig,[2] a 1/3 capital stock interest in the company.[3] Erik Kloster, a business advisor to Spacesaver, was the original trustee. He appointed Adam, Hamilton, and Craig as additional trustees.[4] In 1995, all three of the Schmidts' chil-

---

**2.** Craig is the half-brother of Adam and Hamilton.

**3.** A Shareholders Agreement set out further details of the trust.

**4.** The trust provided that any stockholder owning at least 1/3 of the Spacesaver stock was entitled to be a trustee.

dren were employed by Spacesaver in executive capacities and served on its board of directors.[5]

Controversies among them led to the 2006 drafting of identical (except for name and title) "Executive Employment Agreements" for each of the Schmidts' three children, along with a "Stock Purchase Agreement." These documents were drafted by Albert Ellentuck, Spacesaver's corporate attorney.[6]

At issue in this case is Adam's Employment Agreement, which she signed as the "Employee" and which Craig signed as the "President" on behalf of Spacesaver. It includes the following provisions:

- Section 2.1 ("Compensation and Benefits: Base Salary"):

  Employee shall be paid an annual base salary in an amount specified on Exhibit A attached hereto and made a part hereof.... [7] Any increases or decreases in Employee's Base Salary for years beyond the first year of Employee's employment shall be reflected on an amended Exhibit A, and shall be in the sole discretion of Company management, and nothing herein shall be deemed to require any such change.

- Section 3 ("Duties and Performance"):

  The Employee acknowledges and agrees that she is being offered a position of employment by the Company with the understanding that the Employee possesses a unique set of skills, abilities, and experiences which will benefit the Company, and she agrees that her continued employment with the Company, whether during the term of this Employment Agreement or there-

---

5. According to Spacesaver's brief, by 1995 Craig was President, Hamilton was Chief Executive Officer, and Adam was Vice President.

6. Craig testified that these documents were "set up to formalize the way we ... worked together, and to spell out how we might part ways," while Adam, Hamilton, Kloster, and Ellentuck testified that these agreements were directed toward removing Craig—who was suspected of wrongdoings—from the company.

7. Exhibit A was never created.

after, is contingent upon her successful performance of her duties as noted above, or in such other position to which she may be assigned.

● Section 3.2 ("Specific Duties"):

The employee shall have the title of Managing Director, and shall have the following duties:

1) Create and manage a well balanced executive management team to ensure long term success and provide the ability for planning, organizing, control and leadership. Head towards setting company up for a transitional role of active management.

2) Contribute to company profitability through sales.

3) Ensure company profitability through accurate and effective management of Administration. Includ[ing] the training and development of staff, project planning, management, communication of status, and all other aspects.

4) Manage employee job performance and compliance of all company policies and procedures. Coach supervisors in the performance management process.

5) Provide active oversight, management and direction for sales, sales management and financial administration of the company.

6) Foster an environment of team orientation and individual ownership by establishing constructive relationships between employees. Inspire[ ] teamwork between employees, provides effective management, exhibit[ ] personal responsibility for team goals and attend[ ] bi-weekly management team meeting.

7) And all other duties as decided by the board of directors.

● Section 4 ("Termination of Employment"):

Employee's employment with the Company may be terminated, prior to the expiration of the term of this Employment Agreement[,] in accordance with any of the following provisions:

4.1 Termination by Employee. The employee may terminate her employment at any time during the course of this agreement by giving three (3) months notice in writing to the President of Company....

4.2 Termination by the Company For Cause. The Company may, at any time and without notice, terminate the Employee for "cause." Termination by the Company of the Employee for "cause" shall include but not be limited to termination based on any of the following grounds: (a) insubordination or refusal to perform duties of employee's position as directed by the President of Company and affirmed by a majority of the Directors; (b) fraud, misappropriation, embezzlement or acts of similar dishonesty; (c) conviction of a felony involving moral turpitude; (d) illegal use of drugs or excessive use of alcohol in the workplace; (e) intentional and willful misconduct that may subject the Company to criminal or civil liability; (f) breach of the Employee's duty of loyalty, including the diversion or usurpation of corporate opportunities properly belonging to the Company; (g) willful disregard of Company policies and procedures; (h) material breach of any of the terms herein; and (i) material nonperformance or negligence in Employee's performance of her duties.

4.3 Termination by Death or Disability. The Employee's employment and rights to compensation under this Employment Agreement shall terminate if the Employee is unable to perform the duties of her position due to death, or disability as defined above....

- Section 6 of the Employment Agreement includes non-compete and non-solicitations clauses during and for two years after employment with Spacesaver.

- And, section 8.2 ("General Provisions: Amendments and Termination: Entire Agreement"): "[t]his Agreement may not be amended or terminated except by a writing executed by all of the parties hereto."

Article 4 ("Option to Purchase Shares") of the Stock Purchase Agreement states:

In the event any of the Shareholders has committed any Prohibited Act (as defined below) in relation to the Company ("Designated Shareholder"), the other Shareholders may elect to purchase all or a portion of the shares of the Designated Shareholder.... A prohibited Act is defined for these purposes as one or more of the following: (1) fraud, misappropriation, embezzlement or acts of similar dishonesty; (2) conviction of a felony involving moral turpitude; (3) illegal use of drugs or excessive use of alcohol in the workplace; (4) intentional and willful misconduct that may subject the Company to criminal or civil liability; (5) breach of duty of loyalty, including the diversion or usurpation of corporate opportunities properly belonging to the Company, (6) willful disregard of Company policies and procedures; (7) material breach of any of the terms herein, and (8) termination for whatever reason of said Shareholder's employment with the Corporation.[8]

The Stock Purchase Agreement also includes provisions for the sale of stock upon the death or disability of a shareholder.

Craig resigned as President of Spacesaver and as a director on January 19, 2007. On March 28, 2008, he sold half of his Spacesaver stock to Adam, and the other half to Hamilton.[9]

---

**8.** With the exception of (8) in article 4 of the Stock Purchase Agreement ("termination for whatever reason of said Shareholder's employment with the Corporation") and (a) in section 4.2 of the Employment Agreement ("insubordination or refusal to perform duties of employee's position as directed by the President of Company and affirmed by a majority of the Directors"), the "prohibited acts" in the Stock Purchase Agreement are identical to the "grounds" for termination in the Employment Agreement.

Ellentuck testified that section 4.2 of the Employment Agreements "tracks" article 4 of the Stock Purchase Agreement: "[t]he purpose of that was to say, if you get fired for cause, then you got to sell your shares." The trial court observed: "if you look at all the agreements, ... if there's cause, that cause plugs right into the forced sale for stocks." According to Ellentuck, prior to the execution of "these agreements," there was "no way" to "compel" a terminated shareholder to sell his or her stock to the remaining shareholders.

**9.** When Craig no longer held a 1/3 stock interest in Spacesaver, his role of trustee also terminated.

In February 2009, the board elected Hamilton as President and Chief Executive Officer of Spacesaver, and Adam as Secretary and Treasurer. Adam's Employment Agreement also lists her title as Managing Director of Spacesaver—reporting to the President—while her amended complaint states that she is also Vice President of Special Projects.

Subsequently, a bitter dispute arose between Adam and Hamilton regarding their compensation, roles, and responsibilities within the company. On April 12, 2009, Hamilton sent a letter to Adam which:

- indicated that, at a February 20, 2009 meeting, the board had elected to remove Adam from her sales responsibilities;
- stated that Adam's "duties and authority as Secretary and Treasurer ... are limited to the authority spelled out in the By-laws," and that Hamilton had assigned Adam "no other duties"; and
- warned Adam that if she "fail[ed] to follow" these "directives," Hamilton would "seek to have the Board reduce [her] compensation by 50%," or "seek to have [her] terminated *for cause* as an employee of Spacesaver...."

(Emphasis added).

On May 22, 2009, Adam wrote Hamilton claiming that, because Hamilton had committed various "Prohibited Acts" under the Stock Purchase Agreement—including the "misappropriation of funds," "breach of duty of loyalty," and "willful disregard of Company policies and procedures"—Adam was "exercising [her] right" under article 4 of the Stock Purchase Agreement to acquire Hamilton's Spacesaver stock.

On May 28, 2009, Hamilton wrote Adam denying Adam's assertions, alleging that Adam had committed these "same actions," and indicating her intent to acquire Adam's Spacesaver stock. The letter concluded: "please be advised that your employment by the Company is hereby terminated.... Such termination of your employment also constitutes a prohibited act by you under article 4 of the Stock Purchase Agreement."

In June 2009, Adam brought legal action in a suit that resulted in an agreement whereby Adam received, based on her salary immediately preceding Hamilton's May 28, 2009 letter, $10,000 per month in compensation from Spacesaver.[10]

On January 28, 2010, Hamilton wrote to Adam that "Spacesaver ... has made the decision to end your employment," and Spacesaver stopped paying Adam. On August 6, 2010, Hamilton wrote Adam "in regard to" the January 28, 2010 letter and any legal action potentially taken by Adam:

> in the event it should be determined that your termination was invalid and that you are still an employee of the Company, please be advised that as an employee your salary was presumptively reduced to zero as of the date of termination and continues to be at such zero amount, pursuant to the authority of [the] employment agreement.

Adam filed a complaint on April 9, 2010 against Spacesaver and Hamilton in the Circuit Court for Montgomery County, and, on July 30, 2010, she filed an amended complaint. Count I ("Breach of Contract") of the amended complaint alleges that Adam was terminated from Spacesaver without cause [11] in violation of the Employment Agreement and requests $450,000 in compensatory damages based on "lost salary, wages, com-

---

**10.** This agreement was discussed in testimony, but no documentation relating to that action was included in the record in this case.

**11.** On February 25, 2011, Spacesaver sent Adam a letter stating that it "now amends its original letter of termination to include that Ms. Adam has been terminated *for cause* pursuant to ... [section] 4.2 of the [Employment Agreement] based on her sworn testimony as to the actions she engaged in while an employee of" Spacesaver. (Emphasis added). Thus, in a separate suit, Spacesaver filed a complaint for declaratory judgment against Adam arguing that Adam was terminated *for cause* on February 25, 2011. Adam's motion to dismiss Spacesaver's complaint was granted, and, after a trial, Adam was awarded judgment on her counterclaim against Spacesaver for $112,367.73 "on issues re salary, rental car cost, health insurance, car expenses and cell phone expenses[.]" On March 28, 2013, Spacesaver filed a notice of appeal to this Court, and that case is still pending.

During the motions hearing and later at trial in the instant case, Spacesaver's counsel affirmed that, in this case, Spacesaver was *not* arguing that Adam was fired for-cause.

missions and benefits" in addition to the rehiring of Adam, attorney's fees and costs, "[a]nd for such other and further relief as the Court may deem appropriate."

On June 27, 2011, Adam filed a Motion for Partial Summary Judgment contending that section 4 of the Employment Agreement established that she could only be terminated for-cause, and that section 8.2 of the Employment Agreement "makes clear that the term of employment is her life."

Spacesaver filed an Opposition to Motion for Partial Summary Judgment and Cross–Motion for Summary Judgment in which, pointing to section 3 of the Employment Agreement, it denied that it guaranteed Adam lifetime employment, but that, even had it done so, the Employment Agreement lacked the "additional consideration" necessary for a lifetime employment contract. Spacesaver also denied, pointing to the word "may" in section 4.2, that it was restricted to terminating Adam for-cause.

At a hearing on the motions for summary judgment, the parties, although disagreeing to its meaning, agreed that: (1) the Employment Agreement was "unambiguous," (2) there were no material disputes of fact, and (3) the sole question before the court was whether the Employment Agreement was at-will or for-cause. Both motions for summary judgment were denied. In disagreeing that the Employment Agreement was "unambiguous," the motions court pointed out that "a contract such as this which is silent as to the term [or duration] of the employment relationship is presumed to establish an at-will relationship, terminable for any reason or no reason at all," which conflicted with the for-cause language of the Employment Agreement. The court stated that "extrinsic evidence" was necessary in order to discern the intent of the parties to the Employment Agreement.

After a three day trial, the trial court,[12] referring to the testimony of Craig and Adam regarding their intentions as the

---

12. The trial judge was not the motions judge.

signers of the Employment Agreement,[13] found that the Employment Agreement "modified" what had been formerly an "at-will relationship" so as to make it a "lifetime contract" and that Adam could only be unilaterally terminated for cause, death, or disability. According to the court, the for-cause provision would be superfluous if the Employment Agreement was at-will: "why in the world would you have to worry about [cause] if you had an at-will contract?" Finding a "clear breach" of the Employment Agreement, the court awarded Adam $255,868.20 in damages from the date of her termination through the date of trial—$198,000 from wages ($10,000 per month in salary × 16.5 months) and $57,868.20 in commissions.[14] A judgment was entered in favor of Adam in the amount of $255,868.20.

## DISCUSSION

### *Standard of Review*

■ Under Rule 8–131(c), we review the judgment of the trial court "on the evidence" following a bench trial under the "clearly erroneous" standard. But, "[t]he interpretation of a written contract is a legal question subject to *de novo* review

---

**13.** Adam and Craig testified that they both planned to work at Spacesaver for the rest of their lives, whereas Hamilton testified that they were all at-will employees, and the duration of their employment with Spacesaver, if any, "was as long as we could all get along together potentially[.]" According to Hamilton, although, as at-will employees, the Employment Agreement was not necessary, "the thought was if we had an agreement, legally we would be more protected as an organization[.]" Ellentuck testified that the Employment Agreement was an at-will contract, and that it was never intended to provide lifetime employment. Kloster testified that he had "never heard a discussion about there ... being any lifetime agreements for the company, and if there would have been, [he] would have expressed deep concern about having lifetime agreements."

**14.** We note that, at trial, Adam's counsel stated: "we're arguing that [Adam] is owed ... 20 months of appropriate salary, plus back pay for about two years." The trial judge expressly stated that it was "rendering no opinion in connection" to whether, "if this continues to be a breach as the time goes by," Adam "can sue periodically on the breach." We too express no opinion on that issue.

by the appellate courts." *Calomiris v. Woods,* 353 Md. 425, 447, 727 A.2d 358 (1999). The Court of Appeals has said:

Maryland courts follow the law of objective interpretation of contracts, giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean:

"[A court is to] determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean."

*Towson Univ. v. Conte,* 384 Md. 68, 78, 862 A.2d 941 (2004) (quoting *Calomiris,* 353 Md. at 436, 727 A.2d 358). We review a trier of fact's computation of damages for clear error. *See State Highway Administration v. Transamerica Ins. Co.,* 278 Md. 690, 710–11, 367 A.2d 509 (1976).

### Nature of the Employment Agreement

Spacesaver contends that: (1) the trial court erred in finding that the Employment Agreement was for-cause,[15] and (2)

---

**15.** In it's reply brief, Spacesaver avers that the Employee Handbook, which repeatedly indicates that employment with Spacesaver is "at-will," impacts the nature of Adam's employment. In Maryland, some "decisions finding in favor of discharged employees have ... involved reliance by employees on policy manuals...." *Castiglione v. Johns Hopkins Hospital,* 69 Md.App. 325, 340, 517 A.2d 786 (1986). Provisions in policy manuals "may, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee." *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md.App. 381, 392, 486 A.2d 798 (1985); *see also Dahl v.*

the trial court erred in finding that the Employment Agree-
ment provided lifetime employment.[16]

———

> *Brunswick Corp.*, 277 Md. 471, 476, 356 A.2d 221 (1976) ("[E]mployer
> policy directives regarding aspects of the employment relation become
> contractual obligations when, with knowledge of their existence, em-
> ployees start or continue to work for the employer.").

This Court has, however, "refused" to find the provisions of a
handbook enforceable where a "clear and unequivocal" disclaimer is
included therein, *Haselrig v. Public Storage, Inc.*, 86 Md.App. 116, 128,
585 A.2d 294 (1991), such as a disclaimer stating that "this handbook
does not constitute an express or implied contract. The employee may
separate from his/her employment at any time; the Hospital reserves
the right to do the same." *Castiglione*, 69 Md.App. at 329, 517 A.2d
786. Here, the Employee Handbook contains a disclaimer that it is
"not intended to create contractual obligations with respect to any
matters it covers," and, thus, we do not find that the handbook
provisions inform our analysis in this case.

Additionally, at trial, Spacesaver's counsel, referencing the language
in Section 3 of the Employment Agreement that Adam's "continued
employment ... is contingent upon her *successful performance* of her
duties," commented to Adam, "there was a dissatisfaction with your
performance in that [sales] role, correct?" (Emphasis added). Adam
denied that assertion. Spacesaver has not argued, on appeal, that
Adam was terminated pursuant to the "successful performance" clause.

**16.** In its reply brief, Spacesaver states that the Employment Agreement
is "unenforceable" because: (1) "there was no meeting of the minds of
the parties ... as to a term of employment or salary," and (2) "its
material terms—the duration of employment and salary—are missing."
At trial, during opening statements, Spacesaver's counsel stated that the
court

> will have an interesting challenge when the case is concluded in
> terms of the evidence determining whether or not the failure to
> have a meeting of the minds about Exhibit A means that they never
> had a meeting of the minds about the entirety of the agreement, or
> whether or not there's something left in effect from it.

Later, when pressed by the trial court, Spacesaver's counsel clarified
that although it was Spacesaver's position that the Employment Agree-
ment "wasn't complete" because "there was no meeting of the minds"
about the salary provision, it was not arguing that the contract was
void: "I don't think I used the word void, I never said that" and "it's
not something that I have stood and asked the Court to rule on...."
Because the argument that the Employment Agreement is somehow
"unenforceable" or "void" was not advanced by Spacesaver during
trial or in its original brief, we decline to consider it. *See Strauss v.
Strauss*, 101 Md.App. 490, 509 n. 4, 647 A.2d 818 (1994) ("[T]he scope
of a reply brief is limited to the points raised in appellee's brief, which,
in turn, address the issues originally raised by appellant. A reply brief

Adam replies that a contract "without a term is not automatically at-will. . . ." Rather, a contract "is presumed to be at-will, but that presumption will be over-ridden if the [contract] *either* specifies a termination date *or* specifies an event (*i.e.*, misconduct, insubordination, etc.) that would give rise to termination." When their respective arguments are distilled, both Adam and Spacesaver recognize that this case centers on the interpretation of an employment contract between a corporation and one of its two equal beneficial shareholders that, as stated by Spacesaver, has "no term of employment (suggesting at-will employment)," but also "a 'for cause' termination provision (suggesting employment that is not at-will)[.]"

■■■ This Court has said that employment contracts are either at-will or for-cause. *See, e.g., Chai Management, Inc. v. Leibowitz,* 50 Md.App. 504, 513, 439 A.2d 34 (1982); *Shapiro v. Massengill,* 105 Md.App. 743, 754, 661 A.2d 202 (1995). At-will employment contracts "may be terminated without cause by either party at any time." *Castiglione v. Johns Hopkins Hospital,* 69 Md.App. 325, 338, 517 A.2d 786 (1986) (citations omitted).[17] Employment contracts are "presumptively" at-will. *Towson Univ.,* 384 Md. at 79, 862 A.2d 941.

■■■ The Court of Appeals has stated that (1) "a provision that permits termination only for cause,"[18] *or* (2) "a contractual delineation of the length of the employment period,"[19]

cannot be used as a tool to inject new arguments.") (internal citations omitted).

17. At-will employees cannot, however, be terminated for reasons which violate public policy or a statutory prohibition. *See Suburban Hosp., Inc. v. Dwiggins,* 324 Md. 294, 303, 596 A.2d 1069 (1991).

18. "For-cause" contracts have also been referred to as "just cause" and "good cause" contracts. *See, e.g., Towson Univ.,* 384 Md. 68, 862 A.2d 941. "[W]hether conduct amounts to 'just cause' necessarily varies with the nature of the particular employment. Simply put, what satisfies just cause in the context of one kind of employment may not rise to just cause in another employment situation." *Samuels v. Tschechtelin,* 135 Md.App. 483, 526, 763 A.2d 209 (2000).

19. "[B]y specifying the length or term of employment, the employer usually is considered to have surrendered its ability to terminate the

*Towson Univ.*, 384 Md. at 80, 862 A.2d 941, will overcome the "heavy burden" of the at-will presumption, Mazaroff & Horn, *Maryland Employment Law,* § 3.02[1] (2d ed.2012), and "will create a [for-]cause employment relationship...." *Towson Univ.*, 384 Md. at 80, 862 A.2d 941. This Court has said that the length of an employment period may be delineated by "a particular time or event terminating the employment relationship." *Shapiro,* 105 Md.App. at 754, 661 A.2d 202 (citing *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md.App. 381, 388, 486 A.2d 798 (1985)).

■ Although Maryland's appellate courts have said that a for-cause provision in a contract will "independently" establish that an employee is not at-will, *Towson Univ.*, 384 Md. at 80, 862 A.2d 941, and that the omission of a durational term of employment [20] establishes that an employee is at-will, *Lubore v. RPM Assocs.,* 109 Md.App. 312, 327, 674 A.2d 547 (1996), it is important to recognize that such statements are simply "rule[s] of contract construction," Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts,* § 54:39 (4th ed.2001), and have not been followed "to a T." In the end, the "controlling factor" in interpreting an employment contract is "the intent of the parties with respect to the terms of the contract[.]" *Staggs,* 61 Md.App. at 388, 486 A.2d 798 (quoting *Hodge v. Evans Financial Corp.,* 707 F.2d 1566, 1568 (D.C.Cir.1983)).

In *Staggs,* for example, employees of Blue Cross did not have a "fixed contract or term of employment, although all

---

employee at its discretion." *Towson Univ.*, 384 Md. at 80, 862 A.2d 941. In that situation, the employee can be terminated for "common law cause," such as "a breach which is material, or which goes to the root of the matter or essence of the contract." *Id.* at 94, 862 A.2d 941 (quoting *Regal Sav. Bank v. Sachs,* 352 Md. 356, 364, 722 A.2d 377 (1999)).

**20.** The phrase "durational term of employment" is used to refer generally to a provision that sets a particular time or event terminating the employment relationship. *See* Arthur S. Leonard, *A New Common Law of Employment Termination,* 66 N.C. L.Rev. 631, 637 (1988) ("the lack of a durational term appears to create an important gap").

were covered by certain personnel policies adopted by Blue Cross, as set forth in a 1975 policy memorandum" that laid out grievance and termination procedures, and included a for-cause termination provision. *Id.* at 384, 486 A.2d 798. Several terminated employees brought suit for breach of contract, and the circuit court granted summary judgment in favor of Blue Cross. On appeal, this Court vacated the grant of summary judgment and remanded for a trial. Describing the employment relationship as one "of indefinite duration," *id.* at 388, 486 A.2d 798, we stated that

> provisions in ... policy statements that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment *may*, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee.

*Id.* at 392, 486 A.2d 798 (emphasis added). Recognizing that the *Staggs* result was "to protect the legitimate expectations of employees who have justifiably relied on manual provisions precluding job termination except for cause," we later stated that "the *Staggs*-type exception to the 'at will' doctrine" represents a "limited situation[ ]" in which "an 'at will' employee may not be discharged without cause." *Castiglione v. Johns Hopkins Hospital,* 69 Md.App. 325, 338–41, 517 A.2d 786 (1986).

In addition, the parties may, despite the omission of a durational term of employment, come to a "mutual understanding" that an employee is not at-will. *See Gill v. Computer Equipment Corp.,* 266 Md. 170, 179, 292 A.2d 54 (1972) (a hiring without a durational term of employment "is *prima facie* a hiring at will ... unless there [is] a mutual understanding" otherwise) (quoting *McCullough Iron Co. v. Carpenter,* 67 Md. 554, 557, 11 A. 176 (1887)). In *Board of Street Comm'rs v. Williams,* 96 Md. 232, 53 A. 923 (1903), "no definite number of years" was included in a statute governing employment contracts for police officers, *id.* at 238, 53 A. 923, but the statute did state that officers were "subject to removal for

cause." *Id.* at 234, 53 A. 923. The Court of Appeals observed:

> [R]emoval for cause is ... the only limitation fixed by the statute to their tenure. This being so an appointment is in legal effect an appointment during good behavior, or so long as the appointee is competent to discharge the duties of the office or efficient in the performance of them. *The term is not, therefore, indefinite,* nor is it determinable at the mere will of the appointing power.

*Id.* at 238, 53 A. 923 (emphasis added). In other words, an "appointment which can be terminated only for cause is not an appointment at will, but is, on the contrary, for a definite term[.]" *Id.* at 239, 53 A. 923.

In *County Board of Education v. Cearfoss*, 165 Md. 178, 166 A. 732 (1933), a teacher entered into a contract with the Board of Education of Washington County "for an undetermined number of years[.]" *Id.* at 180, 166 A. 732. After the first or second school year, either party could terminate the contract with adequate notice, but, otherwise, the contract continued "year to year, unless the teacher were suspended or dismissed" for "immorality, dishonesty, intemperance, insubordination, incompetency or willful neglect of duty." *Id.* at 187, 166 A. 732.

The Court of Appeals held that the teacher had "a tenure [21] to continue until abrogated for sufficient cause." *Id.*

---

**21.** This Court has described *County Board of Education* as concerning "the termination of *tenured* teachers...." *Board of Community College Trustees v. Adams*, 117 Md.App. 662, 703, 701 A.2d 1113 (1997) (emphasis added). Although "[p]arties to a contract may ... define tenure differently in their agreement," *Krotkoff v. Goucher College*, 585 F.2d 675, 680 (4th Cir.1978), in educational circles "tenure" ordinarily

> denotes a commitment by the school, as a direct or implied part of its faculty employment agreement, that, upon a determination that the faculty member has satisfied the conditions established by the school, the member's employment will be continuous, subject to termination only for adequate cause. Tenure is said to be "awarded" when, in accordance with its policies and procedures, the school determines that the conditions have been satisfied and the faculty member is entitled to the protected status.

at 188, 166 A. 732. The Court, in a follow-up case, stated that because of "the limitation upon the [County Board's] official power to suspend or discharge a teacher," it was "unable to classify these cases with those in which . . . a private employer . . . has an unrestricted power of rescission[.]" *Board of Education v. Cearfoss,* 168 Md. 29, 34, 176 A. 486 (1935).

■ Guided by *Board of Street Comm'rs* and *County Board of Education,* and the Court of Appeals's statement that a for-cause provision *"independently* establish[es]" that an employee is not at-will, *Towson Univ. v. Conte,* 384 Md. 68, 80, 862 A.2d 941 (2004) (emphasis added), it is our view that the inclusion of the for-cause provision in Adam's Employment Agreement is sufficient to overcome the presumption that, "when the length of the employment contract is not specified, the employee is deemed to be . . . at-will[.]" *Lubore v. RPM Assocs.,* 109 Md.App. 312, 327, 674 A.2d 547 (1996) (citing *Yost v. Early,* 87 Md.App. 364, 383, 589 A.2d 1291 (1991)). *Board of Street Comm'rs* teaches that such contracts, although lacking a typical durational term of employment, are, nonetheless, "for a definite term[.]" 96 Md. at 238–39, 53 A. 923.[22]

■ Such contracts are essentially continuous for-cause contracts that remain in effect until the employee is removed for-cause, or until the employee is no longer "competent to discharge the duties of the office or efficient in the performance of them." *Id.*[23] They are neither a *Staggs*-type subspe-

---

*Johns Hopkins Univ. v. Ritter,* 114 Md.App. 77, 81, 689 A.2d 91 (1996).

**22.** Some contracts have been identified as "indefinite," and thus, at-will, based solely on the lack of a durational term of employment. *See, e.g., Gill v. Computer Equipment Corp.,* 266 Md. 170, 179, 292 A.2d 54 (1972); *Yost,* 87 Md.App. at 384, 589 A.2d 1291 ("Because the length of Early's employment by Saturn was never specified, he was an employee at will."); *Samuels v. Tschechtelin,* 135 Md.App. 483, 525, 763 A.2d 209 (2000) ("An agreement is deemed at-will, and thus terminable without cause, when it fails to specify a particular time or event terminating the employment relationship."). These cases, however, involved contracts *without* a for-cause provision.

**23.** At oral argument, when asked by the Court, "Can the parties contract to have a continuing contract that is terminable for cause?,"

cies of at-will contracts, nor are they "satisfaction" contracts in which the employer, notwithstanding the inclusion of a durational term of employment, "expressly reserves the right to terminate if it deems the employee's performance unsatisfactory." *Ferris v. Polansky*, 191 Md. 79, 85–86, 59 A.2d 749 (1948). The *Ferris* court explained:

> In a contract where the employer agrees to employ another as long as the services are satisfactory, the employer has the right to terminate the contract and discharge the employee, whenever he, the employer, acting in good faith is actually dissatisfied with the employee's work. This applies, even though the parties to the employment contract have stipulated that the contract shall be operative during a definite term, if it provides that the services are to be performed to the satisfaction of the employer.

*Id.*[24]

Continuous for-cause contracts are also not contracts for "lifetime employment," terminable for cause. *See*

---

Spacesaver's counsel replied, "[y]ou can have that contract, but there is a strong bedrock principle of at-will employment." As we have explained, that "bedrock principle" is overcome by the for-cause provision in the Employment Agreement.

**24.** Although a satisfaction contract without a durational term of employment would appear to be similar to a lifetime employment contract terminable for cause in that both are continuous until the occurrence of a contingency, *see* Lucy Haroutunian, Comment: *Employee, You Have A Job For Life: But Is This Oral Promise Enforceable Under The Statute Of Frauds?*, 50 Baylor L.Rev. 493, 509–10 (1998), there is an important distinction between the two. Under a for-cause contract, a fact-finder reviews an employee's *"objective* motivation" for termination,

> *i.e.,* whether the employer acted in objective good faith and in accordance with a reasonable employer under similar circumstances when he decided there was just cause to terminate the employee. The jury's inquiry should center on whether an employer's termination was based upon any arbitrary, capricious, or illegal reason, or on facts not reasonably believed to be true by the employer.

*Towson Univ.*, 384 Md. at 85, 862 A.2d 941.

> In contrast,

> > when an employee is subject to a satisfaction contract, the jury may not review the employer's factual bases for termination, but the

*Chisholm v. Hyattstown Volunteer Fire Dep't,* 115 Md.App. 58, 75 n. 6, 691 A.2d 776 (1997) ("[A] contract for lifetime employment may be terminated for cause at any time."). Lifetime employment contracts, as a matter of law, "should be specific and definite, with little or no room for misunderstanding, even if they are not required to be in writing," *Yost,* 87 Md.App. at 383, 589 A.2d 1291 (quoting *Baltimore & O.R. Co. v. King,* 168 Md. 142, 149, 176 A. 626 (1935)), for

> [a] promise of permanent or lifetime [25] employment may be nothing more than a casual aside. Or, it may be purely aspirational. The employer may be expressing his hope that a valued employee will stay with him forever. However, he may not have intended to create a binding agreement.

*Greene v. Oliver Realty, Inc.,* 363 Pa.Super. 534, 555, 526 A.2d 1192 (1987). Thus, "such a contract" must contain "the terms as to work and salary." *Chesapeake & Potomac Tel. Co. v. Murray,* 198 Md. 526, 534, 84 A.2d 870 (1951) (citations omitted).[26] This is so even when the employee is a co-founder of the business.[27]

---

> jury is permitted to review the employer's motive for termination—specifically, the employer's *subjective* motivation. Subjective motivation means whether the employer was *genuinely or honestly dissatisfied* with the employee's services or merely feigning dissatisfaction.

*Id.* at 83, 862 A.2d 941. Stated differently, in the case of a satisfaction contract,

> dissatisfaction, to justify the discharge of the employee, must be real and not pretended, capricious, mercenary, or the result of a dishonest design. If the employer feigns dissatisfaction and dismisses the employee, the discharge is wrongful. The employer in exercising the right of dismissal because of dissatisfaction must do so honestly and in good faith.

*Ferris,* 191 Md. at 86, 59 A.2d 749 (citations omitted).

**25.** Although cases have not always distinguished between the two terms, in Maryland, "permanent employment ... does not mean employment for life or for any definite number of years." *New England Mut. Life Ins. Co. v. Hurst,* 174 Md. 596, 604–05, 199 A. 822 (1938).

**26.** *Yost, King,* and *Chesapeake & Potomac Tel. Co.* featured oral contracts.

**27.** According to Mazaroff & Horn,

██  To be sure, "an employment agreement can be negotiated for the life of the employee," but only "in very rare circumstances." Mazaroff & Horn, *Maryland Employment Law*, § 3.02 (2d ed.2012). "[C]ourts have shown a marked reluctance to enforce contracts for life employment." Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts*, § 54:39 (4th ed.2001). That is true even when, for example, the contract expressly states that it is "permanent" or "for life." *See* J. Wilson Parker, *At–Will Employment and the Common Law: A Modest Proposal to De–Marginalize Employment Law*, 81 Iowa L.Rev. 347, 380 n. 167 (1995) ("Contracts for 'permanent' or 'lifetime' employment are typically construed to indicate merely that the parties intended that this was to be a steady job, as opposed to casual or temporary employment."); *Aberman v. Malden Mills Industries, Inc.*, 414 N.W.2d 769, 771 (Minn.Ct.App.1987) ("Absent an additional express or implied stipulation of duration of employment, the following terms indicate only an at-will contract: 'permanent employment,' 'life employment,' and 'as long as the employee chooses.' ").

██  Judicial reluctance to find and enforce lifetime contracts stems from the serious consequences of such agreements. Lifetime employment, *if* binding the employee, may impact his "chances of improving his condition," *Pitcher v. United Oil & Gas Syndicate*, 174 La. 66, 139 So. 760, 761 (1932), and prevent him from "quit[ing] at any time without being liable for breach of contract damages[.]" *Lubore v. RPM Assocs.*, 109 Md.App. 312, 328, 674 A.2d 547 (1996); *see* 60 A.L.R.3d 226, § 2a ("[T]he majority of courts appear to take the position that a contract for permanent or lifetime

---

the [*Yost*] court held that the plaintiff's testimony, that he and others founded the corporation; that the founders agreed they would be employed by the corporation as long as the corporation was viable; that all founders would reap the benefits of the corporation in the event the corporation became successful; and that he dedicated all of his time and efforts to make the corporation profitable, was insufficient to establish a claim for lifetime employment because none of the specific terms of the employment contract were agreed upon.
*Maryland Employment Law*, § 3.02[5] (2d ed.2012).

employment remains optional with the employee, and that he may, therefore, terminate it at any time."). On the other hand, binding the employer to "provide a job for so long as the employee wishes to continue" without "impos[ing a] corresponding obligation upon the employee," Williston & Lord, § 54:39, is a "heavy burden to place upon an employer's shoulders." *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 555, 526 A.2d 1192 (1987). A lifetime employment contract for a high level employee, moreover, is "generally inconsistent with corporate law because such a contract denigrates the legal rights of stockholders to change the management of a corporation." Mazaroff & Horn, § 3.02[5]; *see Chesapeake & Potomac Tel. Co. v. Murray*, 198 Md. 526, 531, 84 A.2d 870 (1951) ("The law contemplates the right of stockholders to change the management of the affairs of their corporation periodically by providing for the election of a board of directors. If corporate officers could enter into contracts giving persons of their selection employment for life, the directors might be deprived of their authority."). Here, of course, employees under the Employment Agreements were the beneficial holders of all the stock and directors of the corporation.

According to Williston & Lord, a lifetime employment contract would ordinarily also require "special" or "additional" consideration to be valid, § 54:39, such as "where the employee affords the employer a substantial benefit other than the services that the employee was hired to perform, or where the employee undergoes substantial additional hardship other than the services that he or she was hired to perform." *Id.* § 54:40; *see also* 60 A.L.R.3d 226, § 2a ("[M]any courts take the position that a contract of employment purporting to be permanent in nature or for life is valid and enforceable when it is supported by consideration additional to services.").

Maryland's appellate courts have not decided that a contract for lifetime employment is valid if supported by additional consideration. *See Chesapeake & Potomac Tel. Co.*, 198 Md. at 533, 84 A.2d 870 ("We assume, without deciding, that where an employee has given consideration in addition to the services

incident to the employment, a contract for permanent or life employment is valid....").  Nor have they decided exactly what additional consideration might suffice.  *See id.* at 533, 84 A.2d 870 ("the mere giving up of a job, business or profession by one who decides to accept a contract for alleged life employment" would not suffice); *Pullman Co. v. Ray,* 201 Md. 268, 279, 94 A.2d 266 (1953) ("the release of a claim for damages" in exchange for life employment offered by someone with authority to make the offer would presumably suffice).[28]

But, because we are persuaded, based on the caselaw and the contract's plain language, that the Employment Agreement is effectively a continuous contract terminable for-cause,[29] rather than a lifetime contract, we need not decide

---

28.  Spacesaver, in its brief, states that the "practical effect" of holding that the Employment Agreement is for-cause "is to obligate Spacesaver to Adam for the rest of her life."  It would not be unreasonable to ask: "what is the practical difference between a continuous for-cause contract and a for-cause contract for lifetime employment?"  In *County Board of Education v. Cearfoss,* 165 Md. 178, 166 A. 732 (1933), where the teacher had "a tenure to continue until abrogated for sufficient cause," the Court explained:

> It would not be proper, however, to construe the contract as tending to assure ... permanency of employment.  The officials in charge of the public school system would have no authority to assume for it the financial burdens which might result from such a contractual obligation.  Changing conditions, such as the abandonment of certain courses of instruction, or the consolidation of schools, might reduce the number of positions for which teachers are required.

> *Id.* at 188, 166 A. 732; *see also Board of Community College Trustees v. Adams,* 117 Md.App. 662, 701 A.2d 1113 (1997) (tenured professors could be terminated due to budget constraints); *Woolley v. Hoffmann–La Roche,* 99 N.J. 284, 301, 491 A.2d 1257 (1985) ("The essential difference is that the 'lifetime' contract purports to protect the employment against any termination[.]") (emphasis added).

29.  On appeal, Spacesaver does not argue, as it did in its Opposition to Motion for Partial Summary Judgment And Cross–Motion For Summary Judgment and during the motions hearing, that the use of the word "may" in section 4.2 of the Employment Agreement ("The Company may, at any time and without notice, terminate the Employee for 'cause.' ") did not restrict Spacesaver to terminating Adam for-cause.  We note that, in *Towson Univ. v. Conte,* 384 Md. 68, 862 A.2d 941 (2004), Dr. Conte's employment contract with Towson University provided:

whether any additional consideration advanced by Adam would be sufficient to justify a lifetime contract.[30]

In sum, the Employment Agreement, in our view, is not ambiguous; it is a for-cause contract that is of continuous duration, but it is not a lifetime contract. Thus, we affirm in-

---

The University *may* terminate this appointment for cause which shall include:

    (a) the intentional violation of University of Maryland System Regulations or University regulations

    (b) wilful neglect of duty

    (c) insubordination

    (d) incompetence

    (e) misconduct

    (f) criminal conduct

    (g) long-term physical or mental condition which renders Dr. Conte unable to perform the duties essential to the Director's position

*Id.* at 79, 862 A.2d 941 (emphasis added).

According to the *Conte* Court, although the word "may" indicated that the University was not "require[d]" to terminate Dr. Conte if any of the seven enumerated causes occurred, and that the list of terminable causes was not "exclusive" such that the University could validly terminate Dr. Conte for-cause "regardless of whether that specific just cause [wa]s included in the contract," this did not "transform Dr. Conte into an employee at-will." *Id.* at 93–94, 862 A.2d 941.

**30.** Adam states:

[T]here are a number of special considerations that would support an agreement for lifetime employment here.

    First, Adam owns 50% of the company. Second, Adam could be forced to sell her stock at a discount if she voluntarily left the company or were terminated for cause. Third, Adam was required to give 90 days notice before she could leave the company. Fourth, Adam was prohibited from soliciting the customers [of Spacesaver], hiring its employees or competing against [Spacesaver] "directly or indirectly" during her employment and for two years after the termination of her employment. Each of these alone would satisfy a requirement of special consideration. . . . In combination, they overwhelmingly demonstrate special consideration.

Spacesaver, which notes the lack "of a clear provision providing for lifetime employment," responds:

Adam cites no authority for her proposition that the Employment Agreement's provision of a restrictive covenant or 90-day voluntary termination notice requirement, or the parties' Stock Purchase Agreement, amount to consideration sufficient to bind Spacesaver to a lifetime employment contract.

According to Spacesaver, "in the absence of a clear provision providing for lifetime employment and sufficient additional consideration, the [Employment Agreement] can only provide for at-will employment."

part and reverse in-part the trial court's interpretation of the Employment Agreement.[31]

## Damages: Salary & Commission

■■■ Spacesaver alleges: (1) the trial court erred in awarding damages based on a $120,000 per year salary where the Employment Agreement "contains no salary provision," and "the record below contains no evidence that the parties ever agreed to a salary for Adam," and thus "the trial court stated no legally cognizable basis to award damages"; and (2) the trial court erred in awarding commissions where Adam "sued *only* on the" Employment Agreement, "which does not provide any right to commissions." (Emphasis added).

Adam, pointing to the testimony of Ellentuck that the parties agreed upon a salary of $120,000, states that "[t]he record negates [Spacesaver's] contention" that there was "*no evidence* to support the trial court's finding of an agreement between the parties as to . . . an annual salary for [Adam] of $120,000 per year." In further response, she refers us to the amended complaint, which states that she is seeking compensatory damages based on "lost salary, wages, *commissions* and benefits." (Emphasis added). She also cites the testimony of Ellentuck and Kloster as "demonstrat[ing] that [she] had earned commissions as an employee of" Spacesaver.

■■■ In reviewing the trial court's calculation of damages under the clearly erroneous standard, "[t]he appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed." *Clickner v.*

---

31. Spacesaver also contends that the motions court erred in denying its motion for summary judgment because the Employment Agreement clearly does not "provide for lifetime employment," and thus it cannot be a for-cause contract. Ultimately, this focuses on the same issue as Adam's other primary appeal point: was the Employment Agreement a for-cause contract? Because we hold that it was, we also hold that the court also did not err in denying Spacesaver's motion for summary judgment.

*Magothy River Ass'n,* 424 Md. 253, 266, 35 A.3d 464 (2012) (quoting *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975)). The Court of Appeals has also said that "[i]f there is *any* competent material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005) (citation omitted) (emphasis added).

The trial court stated that, based on "the testimony" and Plaintiff's Exhibit 2,[32] Adam's annual salary was $120,000. In arriving at $198,000 in salary owed to Adam, the court calculated that she was owed $108,00 for work in 2010, and $90,000 for work in 2011. The court also stated, based on Adam's testimony, "that she's proven by a preponderance of the evidence that she's entitled to certain commissions," and, moreover, that "Hamilton agreed in her testimony that Ms. Adam was due commissions."

---

**32.** Plaintiff's Exhibit 2 is an April 17, 2007 email from Ellentuck to Hamilton, with carbon copies to Adam and Kloster. The email states, in pertinent part:

> As Corporate Counsel, I'm confirming the agreed compensation plans to be effective immediately.
> These plans are the outcome of detailed planning and much consideration, and are based on input from [Kloster] and I and from the Performance Group as advisors to the Company. The amounts below have been carefully crafted based on roles, responsibilities & individual strengths contributing to the overall growth and profitability of the Company. [Kloster] & I have discussed these plans in detail with [Hamilton] and [Adam] & have the concurrence of both [individuals]. All plans will be subject to periodic review by the Board, at least once annually.
> Ownership distributions will be based on earnings and profitability at the year's end. Interim distributions may be made at the sole discretion of the Board of Directors.
> *[Adam] has agreed to phase out of sales, but she will be compensated for sales already made.*
> *The compensation plans are listed below:*
> *[Adam] $120 000*
>
> \*     \*     \*
>
> [Hamilton] $290 000 based on $200 000 base & $90 000 for sales.

(Emphasis added).

This email was sent approximately six months after the Employment Agreement was executed.

To be sure, there was conflicting testimony as to Adam's compensation. But Plaintiff's Exhibit 2, which specifically puts Adam's compensation at $120,000 and states that "she will be compensated for sales already made," is sufficient to persuade us that the trial court was not clearly erroneous in calculating Adam's damages under the amended complaint, which specifically asks for damages based on salary and commissions.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE SPLIT EQUALLY BETWEEN THE PARTIES.**